**Jake Harper, Attorney**
240 West 73rd St., #811
New York, NY  10023
**TEL:  (212) 406–2606**
**FAX: (212) 496-1846**
**Email:  jakeharper3@gmail.com**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

WESAM EL-HANAFI,

                              Plaintiff

                                                      **FIRST AMENDED COMPLAINT**

                                                      **Case No.:      13 – CV – 2072**
                                                                          **(PAC)  (AJP)**

        -   against –

UNITED STATES of AMERICA;
SEAN COOPER, Vice Consul of the U.S. Embassy in Dubai,
        *official and individual capacities*;
DANIEL WITHERS, agent of the Federal Bureau of Investigation,
        *official and individual capacities*;
CHARLOTTE "DOE", agent of the Federal Bureau of Investigation,
        *official and individual capacities*;
JOHN and JANE DOES, agents of the Federal Bureau of Investigation
        or the Office of the United States Marshalls, *official and individual capacities*;
FEDERAL BUREAU of PRISONS (BOP) and METROPOLITAN
        CORRECTIONAL CENTER (MCC) (a *Monell* claim);
SUZANNE HASTINGS, Warden, MCC,
        *official and individual capacities;*
ADAM JOHNSON, Esq., Supervising Attorney, MCC,
        *official and individual capacities*;
MARK GLOVER, M. D., MCC Clinical Director (Retired)
        *official and individual capacities*;
ANTHONY BUSSANICH, M. D., MCC Clinical Director
        *official and individual capacities*;
JOHN/JANE DOE, M.D., Federal Transfer Center, Oklahoma
        City, Oklahoma, Clinical Director,
        *official and individual capacities*;
JOHN/JANE DOE, M..D., Alexandria, Virginia Facility, Clinical
        Director, *official and individual capacities*;
EVANGELISTA, C., MCC/MLP, *official and individual capacities;*
ABOULFATEH, A., MCC/MLP,  *official and individual capacities;*
RAMOS, E., MCC/MLP,  *official and individual capacities;*
COOPER, T. A., MCC/ Health Information Technician,  *official and individual capacities;*
SMALL, JULIE, MCC/ Health Information Technician,  *official and individual capacities;*

JOHN/JANE DOES, MCC Staff Health Care,  *official and individual capacities;*
JOHN/JANE DOES, OKC Federal Transfer Center Staff Health Care,  *official and individual capacities;*
JOHN/JANE DOES, Alexandria Facility (Va.) Staff Health Care,  *official and individual capacities;*

Defendants

## PRELIMINARY STATEMENT

This is a claim brought under the Federal Tort Claims Act (FTCA) together with a civil rights action under 42 U.S.C. Section 1983 (*Bivens*) which contains a *Monell* claim alleging constitutional violations of Mr. El-Hanafi's rights due to policies and customs followed by BOP/MCC medical supervisors and staff, and a New York state supplemental claim for medical negligence, concerning defendants' negligent, reckless and deliberate indifference to accepted standards of medical care.  Mr. El-Hanafi's symptoms arose following his voluntary and peaceful submission to the custody of agents of the United States in Dubai on April 27, 2010.  At the time he was submitted to federal custody Mr. El-Hanafi was 34 years of age and in good health.

Mr. El-Hanafi was held in custody for three days by Dubai police under the order and control of the government of the United States.  During those three days his legs were constrained by shackles and his ability to exercise in a normal way severely restricted. Mr. El-Hanafi was thereafter flown, under the custody and control of United States agents, from Dubai to Dulles Airport in the United States.  These agents were, for the most part, members of the Federal Bureau of Investigation (FBI).  The plane trip lasted for a period of sixteen hours including landing and takeoff time.  Although not shackled during the flight, Mr. El-Hanafi was discouraged from the normal and regular use of his legs.  For a period of fourteen hours of air transport time, he was effectively denied the use of his legs.  He received a period of approximately fifteen minutes during those fourteen hours to visit the bathroom and pray.  This extraordinary limitation on his ability to stretch and move about during his in-flight detention was later designated -- by outside medical consultants outside the place of his incarceration in the Metropolitan Correctional Center (MCC) -- as the point where Mr. El-Hanafi's symptoms began.  Upon incarceration in the Bureau of Prisons (BOP) system, Mr. El-Hanafi's symptoms were permitted by defendants' neglect, recklessness and deliberate indifference, to deteriorate into a condition known clinically as Deep Vein Thrombosis (DVT).  The diagnosis of DVT was made by an outside medical group at New York Downtown Hospital following a common and affordable ultrasound study on or about October 4, 2011.  This diagnostic result, and the treatment that followed in its wake, were withheld from Wesam El-Hanafi for more than seventeen months by BOP employees.

Mr. El-Hanafi, incarcerated as a pre-trial detainee in three separate federal facilities, persistently pressed numerous requests for diagnosis and treatment.  His undiagnosed DVT condition worsened rapidly in federal custody.  Mr. El-Hanafi's frequent pleas for help were supported by the swelling of his right foot that was clearly visible to all, his inability to walk normally and the purple-hued discoloration in his lower right leg.  He used ice on his leg in the evenings.  Following fifteen (15) months of delay, a medical consult for the ultrasound study was approved by prison officials on August 16, 2011.  The actual two-block transfer to NY Downtown Hospital for the ultrasound did not occur until September 30, 2011.  The trip for diagnosis was subject to demands by United States security personnel demand that plaintiff be shackled in transit with heavy leg irons.  The shackles pressed directly against Mr. El-Hanafi's tender and swollen ankle.  The application of shackles caused excruciating and, as was later determined, unnecessary pain.  The metal shackles may also have aggravated Wesam El-Hanafi's underlying DVT condition.

Just over two weeks after his diagnosis of DVT, Mr. El-Hanafi was rushed back to NY Downtown Hospital after coughing up blood and suffering breathing problems at MCC.  The diagnosis in hospital records was now positive for "… acute, totally occlusive DVT of all right deep veins…".

Plaintiff El-Hanafi now seeks damages from the United States for negligence in failing to provide an acceptable standard of medical care, from the named defendants for violation of his civil rights in their deliberate indifference to his serious medical needs and, under pendent jurisdiction, and New York state law, for negligence, negligent infliction of emotional distress, and medical malpractice.

## JURISDICTION and VENUE

1. The plaintiff in this action is Wesam El-Hanafi.  Plaintiff brings this action under the Federal Tort Claims Act (FTCA), pursuant to 28 U.S.C. Sections 2671, *et seq.* (entitled "Tort Claims Procedure"), and also under the FTCA pursuant to 28 U.S.C. Sections 1331, 1343(a)(3), 1343 (a)(4), 1346(b), 1402, 2401 and 2671, *et seq.,* and also, as a pre-trial detainee, pursuant to the Fourteenth Amendment of the United States Constitution and the authority of *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and, pursuant to the Eighth Amendment of the United Constitution, for

such periods, if any, during which defendants' actions or inactions caused harm to plaintiff, after he elected to enter a plea in the federal criminal action, seeking compensation for the harms that defendants caused.  A *Monell* claim is attached to the *Bivens* action incorporating those federal policies and customs which caused the delay in providing a diagnosis of plaintiff's serious medical needs and the belated treatment of his DVT condition.  Supplementary jurisdiction is asserted for a separate state law claim under 28 USC Section 1367; supplementary party jurisdiction and supplementary jurisdiction is also invoked under New York State Law for negligence, medical malpractice and negligent infliction of emotional distress.

2.  The amount in controversy exceeds $75,000.00 excluding interest and costs.

3.  As a predicate to this litigation, on March 29, 2012, plaintiff submitted an Administrative Tort Claim (*Form 95*) to the Northeast Regional Office of the Federal Bureau of Prisons, Second and Chestnut Streets, 7th Floor, Philadelphia, PA  19106.  The claim was denied by letter dated October 2, 2012, addressed to Wesam El-Hanafi.  The letter was undersigned by Michael D. Tafelski, Regional Counsel, U.S. Customs House, 2nd and Chestnut Streets, Philadelphia.

4.  Venue is properly in the Southern District of New York in that federal defendant BOP/ Metropolitan Correctional Center (MCC) is located within the SDNY and a substantial part of the acts and omissions at the core of this Complaint occurred within the boundaries of SDNY.  It is believed that all named defendants are either employed or reside within this district.  Plaintiff Wesam El-Hanafi, a citizen of the United States, is presently incarcerated in this district.

## JURY TRIAL DEMAND

5.  Mr. El-Hanafi hereby demands a trial by jury of all issues in this action that are subject to adjudication before a jury.

## PLAINTIFF

6.  Plaintiff Wesam El-Hanafi, now 37 years old, is and was at all times relevant to this Complaint, a citizen of the United States, born in Coney Island Hospital, Brooklyn, New York, on May 19, 1975, and has been incarcerated at the Metropolitan Correctional Center,

150 Park Row, New York City, New York  10013, since on or about May 24, 2010, after voluntarily and peacefully submitting to the custody of the United States of America on April 27, 2010, in Dubai, a city within the United Arab Emirates.  He was a pre-trial detainee at all times relevant to this complaint.

## DEFENDANTS

7.   Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act (FTCA).

8.   Defendant SEAN COOPER is Vice Consul of the United States Embassy in the United Arab Emirates.  Under his orders, plaintiff was taken into U.S. custody.  He has authority to effect the formulation of federal custom, practice and policy regarding management of security issues.  He is under a constitutional duty to protect the health and well-being of pre-trial detainees pursuant to the Fourteenth Amendment.  He knows or should know the health risks posed -- to detainees such as Wesam El-Hanafi -- by the enforcement of extraordinary restrictions on their ability to move during the extended flight time of global, custodial transports.[1]

9.   Defendant DANIEL WITHERS is an agent employed by the Federal Bureau of Investigation (FBI).  Federal agent Withers was in charge of Wesam El-Hanafi's health and physical well-being during the sixteen (16)-hour air transport from Dubai to the United States.  Despite Wesam El-Hanafi's non-violent demeanor and peaceable surrender to United States custody -- and the fact that during the course of flight on board a commercial airliner while government agents conduct a transport "escape" from custody by a detainee is not a significant security issue -- extraordinary restrictions on Mr. El-Hanafi's ability to stretch, move and preserve normal blood circulation, during the course of that extended air time, were imposed by defendant.

10.   Defendant CHARLOTTE "DOE" is an agent employed by the Federal Bureau of Investigation.  Federal agent "Doe" was in charge of Wesam El-Hanafi's health and physical well-being during the sixteen (16)-hour air transport from Dubai to the United States.  Federal agent "Doe" was in charge of Wesam El-Hanafi's health and physical well-

---

[1]   The medical condition known as Deep Vein Thrombosis (DVT) is a serious malady which is known to be caused by, *inter alia*, a patient's lack of proper blood circulation during immobility on long distance airline flights.  DVT is often  referred to in medical literature as "The Economy Flight Syndrome".

being during the sixteen (16)-hour air transport from Dubai to the United States and, under the same conditions set forth regarding her co-defendant Withers in the paragraph above, enforced the extraordinary restrictions on Mr. El-Hanafi's ability to stretch, move and preserve normal blood circulation during the course of that extended air time.

11. Defendants FEDERAL BUREAU of PRISONS and the METROPOLITAN CORRECTIONAL CENTER are entities of the government of the United States charged with oversight and responsibility for federal prisoners incarcerated in the United States or, in the case of MCC, at MCC. Each entity determines policy, custom and practice regarding the medical care received by detainees pending disposition of charges or, following entry of a plea, as to inmates whose plea is accepted by the court, incarcerated at their respective facilities.

12. Defendant SUZANNE HASTINGS is the former Warden of MCC/NY. She was employed as Warden from the date of Wesam El-Hanafi's incarceration at MCC until the belated diagnosis of his condition as DVT made by medical specialists outside MCC on or about October 4, 2011. She had oversight responsibility as to customs, practices and policies related to the management of inmates incarcerated at MCC. This oversight responsibility includes the medical care and physical well-being of Wesam El-Hanafi and all other inmates incarcerated at MCC/NY. Her replacement and new Warden at MCC, Lynn Beavers, is not named as a defendant in this complaint.

13. Defendant ADAM JOHNSON is employed as Supervising Attorney of MCC. His duties are not primarily related to inmate health issues but embrace the entirety of MCC. He has appeared at court conferences related to plaintiff's health and undertaken tasks in regard to particular issues raised therein. Mr. Johnson has supervisory authority concerning facility policies, practices and customary staff management of prison issues, including those related to inmate health.

14. Defendants MARK GLOVER, M.D., MCC/NY Clinical Director (Retired);  ANTHONY BUSSANICH, M. D., MCC/NY Clinical Director; JOHN/JANE DOES, M.D. Supervising Clinician, Federal Transfer Center, Oklahoma City, Oklahoma;  and JOHN/JANE DOES, M. D., Supervising Clinician, Alexandria BOP Facility, Alexandria, Virginia. Each defendant named and unnamed in this paragraph has official and individual responsibilities

for inmate health issues at their respective facilities and for the policies, practices and customary management of such issues within their respective facilities.

15. ABOULFATEH, A., MCC/MLP; MITCHELL, T., MCC/PA-C; EVANGELISTA, C., MCC/MLP; RAMOS, E., MCC/MLP; COOPER, T. A., MCC/Health Information Technician; SMALL,JULIE, MCC/ Health Information Technician; JOHN/JANE DOES, MCC Staff Health Care; JOHN/JANE DOES, Federal Transfer Center (Oklahoma City, Okla.) Staff Health Care; JOHN/JANE DOES, Alexandria Facility (Va.), Staff Health Care. These federal Bureau of Prisons defendants are employed by BOP facilities located in New York, N.Y. (MCC); Oklahoma City, Okla. (FTC); and Alexandria, Virginia.

16. Each above-named defendant is sued in their official capacity or in both his or her official and individual capacities, as has been indicated in the caption with respect to each defendant.

17. At all times relevant to this Complaint, the defendant employees were acting within the course and scope of their employment with the federal BOP.

18. Each named defendant in this Complaint was acting under color of law at all times relevant to this complaint.

19. All defendants are employed by the federal government of the United States subject to suit under the Federal Tort Claims Act, for which the required predicate is properly laid.

20. The defendants herein as employees of the federal government are subject to suit pursuant to 42 U.S.C. 1983 under the authority in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), and as to acts and omissions under federal agency policies, customs and practices which violate plaintiff's constitutional guarantees under the authority of *Monell v. City of New York Department of Social Services*, 436 U.S. 658 (1978).

## THE *MONELL* CLAIM

21. Under the *Monell* claim, each defendant is liable in his official capacity as part of the federal entity at which he is employed.

22. Under the *Monell* claim, each defendant is also liable in his individual capacity, for acquiescing in unconstitutional practices, customs and policies, which caused acts and omissions that violate plaintiff's constitutional guarantees as both a pre-trial detainee(14th Amendment) and after entering a plea to the charge (8th Amendment).

23.   To the extent a defendant was employed as and acted in a supervisory position at a particular federal entity, he or she is liable for inadequate training and hiring policies, for his or her failure to discipline and supervise.  Such defendants are also liable for negligence, recklessness and deliberate indifference to plaintiff's serious medical needs.

## FACTS

24.   Wesam El-Hanafi is now thirty-eight (38) years of age.

25.   Wesam El-Hanafi's was born on May 19, 1975, at Coney Island Hospital in Brooklyn, New York.

26.   Wesam El-Hanafi is a citizen of the United States of America.

27.   Wesam El-Hanafi is presently in the custody and control of the government of the United States of America.

28.   Wesam El-Hanafi is presently confined under the control of the government of the United States of America at the Metropolitan Correctional Center (MCC) at 150 Park Row, Manhattan, New York City, New York  10013.

29.   Since the commencement of his custodial detention and confinement on April 27, 2010, in Abu Dhabi, Wesam El-Hanafi has been under the control and authority of other departments and agencies of the executive branch of the United States government including the Department of State and the Federal Bureau of Investigation (FBI), the latter of which is an agency within the United States Department of Justice.

30.   Wesam El-Hanafi voluntarily and peacefully submitted to the custody of the United States of America on April 27, 2010.

31.   Wesam El-Hanafi was detained and held in custody by the Abu Dhabi Police at the direction of the government of the United States.

32.   Wesam El-Hanafi was detained and held in custody by Abu Dhabi Police pursuant to and under the orders of Sean Cooper, Vice Consul at the United States Embassy in the United Arab Emirates (UAE).

33.   Sean Cooper is an employee in the executive branch of the government of the United States designated to his location of employment, the United Arab Emirates (UAE), by the United States Department of State.

34.  Upon information and belief, Sean Cooper directed that Wesam El-Hanafi be held by the
     UAE in conjunction with and under the individual direction and authorization of other
     employees and agents of the executive branch of the government of the United States who
     were deployed within and to the Federal Bureau of Investigation, an agency of the United
     States Department of Justice.

35.  It is believed that Sean Cooper was aware from the date that Wesam El-Hanafi submitted
     voluntarily and peacefully to custody by the government of the United States, or, initially,
     to custody of the Abu Dhabi Police acting as agents for the United States, that
     Mr. El-Hanafi would shortly be placed in custody on air transport to the United States.

36.  Wesam El-Hanafi was detained and held in custody by the Abu Dhabi Police, under the
     control of the government of the United States, for four days and three nights.

37.  During those four days, Wesam El-Hanafi had virtually no opportunity to exercise. His
     ability to move about or to stretch and exercise his legs was severely constrained.  His
     opportunity to move his legs was only for brief periods of time.  If and when he was
     escorted from the jail to another location, such as to the office of Sean Cooper, his
     movement was constrained by metal shackles which cuffed both ankles.

38.  Wesam El-Hanafi was in good health at the time he was detained.  The developments
     which occurred during his detention—the extraordinary restrictions placed on his ability to
     move and stretch his legs in a normal and natural manner during such detention- were later
     determined to be the proximate cause of Mr. El-Hanafi's contraction of the serious medical
     condition known as Deep Vein Thrombosis (DVT).

39.  Medical records outside medical consultant New York Downtown Hospital  indicate that
     Mr. El-Hanafi's DVT condition was not diagnosed until October 4, 2011.  The relevant
     portion of the New York Downtown diagnosis indicates that the patient Wesam El-Hanafi
     tested positive for "… *acute, totally occlusive DVT of the Right FV (all segments), Pop,*
     *TPT and peroneal…"*.

40.  This diagnosis was not obtained until Wesam El-Hanafi had been under the custody and
     control of agents of the government of the United States, for a period exceeding seventeen
     (17) months.

41.  The extensive seventeen (17) month period with neither diagnosis nor treatment, despite
     Wesam El-Hanafi's numerous, continued and persistent requests for same, was a result of

negligence, recklessness, and deliberate indifference to the health care of Wesam El-Hanafi.

42. Medical records obtained from outside consulting physicians indicate that Mr. El-Hanafi's DVT condition was specifically caused by his prolonged lack of movement and the restriction of normal blood circulation during  the extended air transport of sixteen hours which originated in Dubai and landed at Dulles Airport in the United States.

43. It is relevant to consider that, during the when Wesam El-Hanafi was travelled to Dubai to evaluate employment possibilities in 2005, he flew on his own  from his home in New York to Dubai.  He also made additional flights from New York City to the U.A.E.  On occasion the transatlantic flights made a connection in Europe en route to the Middle East.

44. Mr. El-Hanafi's last two flights to the U.A.E. were for roughly the same duration— fourteen (14) hours—as the flight herein, made after Wesam El-Hanafi's voluntary submission to United States custody.  It is understood that the flights Mr. El-Hanafi took were on plane models similar to the American Airlines flight he boarded in custody on April 30, 2010.  Each flight was made on a commercial airline.

45. On each of the flights indicated above, Wesam, flying without custodial restrictions, took full advantage of his freedom to stretch and move about the airliner.

46. On each of these personal flights, announcements were made encouraging passengers to exercise regular and frequent mobility.

47. On April 30, 2010, Wesam El-Hanafi was taken to Dubai Airport and flown from that location to the United States of America.

48. Wesam El-Hanafi was flown to the United States under the control and custody of agents of the government of the United States.

49. Wesam El-Hanafi was flown on American Airlines.

50. The flight was for a duration of approximately sixteen (16) hours including landing and take-off time.

51. Although Wesam El-Hanafi was not in ankle shackles throughout the approximately sixteen (16) hour flight, he was nonetheless constrained in his ability to move about and he was essentially denied the opportunity to move and stretch his legs in a normal and natural fashion as other passengers and his custodial agents were able to do and, indeed, as Wesam

11

El-Hanafi had been able to do on his own prior flights to and from Dubai and the United States.

52. The agents of the government of the United States who secured Wesam El-Hanafi during the sixteen hours of air time were, *inter alia*, defendant DANIEL WITHERS, an agent employed by the FBI, and a second female FBI agent whose first name is believed to be "Charlotte" (designated in the caption as defendant  CHARLOTTE DOE)

53. During the approximate flight time of sixteen (16) hours from Dubai to Dulles International Airport, Wesam El-Hanafi was not permitted to stretch or exercise his legs and he was therefore unable to get up and move around the airplane in order to circulate the blood throughout his lower extremities.

54. While in flight over the course of approximately sixteen (16) hours, Wesam El-Hanafi was allowed a total of approximately fifteen (15) minutes to utilize the bathroom and  pray.

55. The extraordinary limitations on the ability of Wesam El-Hanafi to exercise, stretch and move about during the 16-hour flight from the UAE to the United States was found by medical specialists outside the BOP system to be the cause of the condition belatedly diagnosed as Deep Vein Thrombosis (DVT).

56. When Wesam El-Hanafi de-planed at Dulles International Airport, he noticed for the first time a stinging sensation in his right calf.

57. Once Wesam El-Hanafi was removed from the airplane at Dulles International Airport, it was approximately five more hours until and before Wesam El-Hanafi was presented by agents of the government of the United States at his arraignment before a United States Magistrate Judge in the United States District Court for the Northern District of Virginia.

58. Wesam El-Hanafi complained to government agents near his holding cell at the Virginia facility, prior to his arraignment, about the stinging sensation in his calf.

59. The cuffs and shackles were removed from Wesam El-Hanafi's wrists and ankles for approximately fifteen (15) minutes during his arraignment.

60. Subsequent to his arraignment, Wesam El-Hanafi remained in the custody and control of agents of the United States government at a facility in Virginia maintained and operated by the federal BOP, an agency in the executive branch of the government of the United States within the Department of Justice.

61. Wesam El-Hanafi remained at that Virginia facility for approximately eleven (11) days.

62. During that eleven (11) day period, Wesam El-Hanafi was maintained and detained in isolation for twenty-two (22) hours per day.

63. Wesam El-Hanafi received two (2) hours per day during that approximately eleven (11) day period for "recreation" in an indoor cage.

64. The two-hours made available for recreation were between the hours of 1 AM and 3 AM.

65. During his incarceration in isolation in Virginia, Wesam El-Hanafi continued to experience the stinging pain in his calf that he had first noticed when deplaning at Dulles International Airport. Wesam El-Hanafi decided to make the most out of his two-hour period of "recreation", and did strenuous exercises in hopes of alleviating the pain he felt in his right leg.

66. The exercises did not improve the stinging pain in his right calf portion of his leg. Soon the pain Wesam El-Hanafi felt in his calf, without abating there, also began to be felt by Mr. El-Hanafi in his right ankle.

67. On the first or second day of his Virginia confinement, Wesam El-Hanafi complained to the agents of the government of the United States, under whose custody and control he was detained, about the afore-described pain from which he was now continuously suffering.

68. Wesam El-Hanafi spoke to a female clinician who made rounds at the Virginia facility. He described his symptoms. He described to her not only the pain but the restrictions on his movement during the 16-hour flight from Dubai. This government employee, whose name Mr. El-Hanafi does not now recall, offered her opinion that the pain was probably the result of a slower circulation of his blood in his lower extremities.

69. At the BOP facility in Virginia, Wesam El-Hanafi was given one or two tablets of ibuprofen.

70. Nothing else was done to address the underlying condition about which Wesam El-Hanafi had complained. No agent of the government referred Mr. El-Hanafi for an examination and medical diagnosis.

71. On or about May 11, 2010, Wesam El-Hanafi was transferred, in the custody and control of United States federal agents, in leg shackles, to a federal transfer facility in Oklahoma maintained and operated by the BOP within the Department of Justice of the executive branch of the government of the United States.

72. The transfer to Oklahoma and all associated therewith took approximately fifteen (15) hours during which Wesam El-Hanafi was detained and maintained under the control and authority of agents of the government of the United States, in tightly-employed metal leg shackles.  His wrists were cuffed in metal and the hands and legs were tied off with a waistband.  This binding arrangement extraordinarily limited the ability and opportunity of Wesam El-Hanafi to stretch and exercise his lower body extremities including his legs and/or to move about in a normal and natural manner that promoted circulation in his lower body extremities including his legs.

73. The time consumed for the transfer to Oklahoma entailed an extended transport from the Virginia facility to the airport prior to the flight.  First, Wesam El-Hanafi was placed in the bullpen for approximately four hours.  Next, the trip to the airport consumed an additional five hours in a prison van to board a non-commercial plane loaded with prisoners only.  The van trip was followed by approximately 4 to 5 hours of air time.  Mr. El-Hanafi was bound in cuffs and shackles, joined by a waistband, for the entire fifteen (15) hour period.

74. During the transfer to Oklahoma, Wesam El-Hanafi was continuously inflicted and afflicted with intense pain and suffering in his right ankle area and right leg calf area.

75. When Wesam El-Hanafi arrived at the federal transfer facility in Oklahoma, where he was maintained and detained in the custody and control of agents of the government of the United States, the shackles on his ankles were removed and his pain instantly lessened..

76. The morning after his arrival, Mr. El-Hanafi attended "sick call" and was issued, once again, ibuprofen.  The ibuprofen was given to Mr. El-Hanafi despite the information he gave to the agents of the government of the United States that he had previously been issued ibuprofen in Virginia and that only short-term relief was provided from the pain he was suffering and that the condition of his right ankle and right leg calf area was worsening and not improving.

77. From the date of his arrival in Oklahoma and for the succeeding days of his stay at the transfer facility Mr. El-Hanafi was, as had been the case at the BOP Virginia facility, housed in isolation.

78. At the Oklahoma facility, Mr. El-Hanafi was permitted one hour of recreation per day, from 6 AM until 7 AM.  Mr. El-Hanafi utilized his recreation period on only two occasions due to the increasing pain in his ankle and calf areas.

79. Aside from re-issuing the ibuprofen, the agents of the government of the United States did nothing further to assess the condition about which Wesam El-Hanafi had been complaining and was complaining from almost the outset of his detention in the custody and control of agents of the government of the United States.  Wesam El-Hanafi was seen by a physician's assistant and then by an unnamed person believed to be a medical doctor.  The doctor informed Mr. El-Hanafi that he may have an inflamed cyst in his leg.

80. No tests -- such as an ultrasound procedure, a well-known, common and inexpensive test that detects, among other things, the presence of Deep Vein Thrombosis, and the same procedure which was performed eighteen months later on October 4, 2011, by an outside hospital, and confirmed the diagnosis of DVT were ordered.  No medication, aside from ibuprofen, was issued or prescribed.

81. Wesam was held in the custody of the federal government at the Oklahoma transfer facility for approximately fourteen days.

82. On or about May 24, 2010, Wesam El-Hanafi was transported from the federal transfer facility in Oklahoma to the federal Metropolitan Correctional Facility (MCC) in New York City.

83. The day of his departure from the federal facility in Oklahoma, Wesam El-Hanafi was again placed in heavy metal ankle shackles.  He waited to board his flight for roughly four hours, all while shackled.  Then he was placed on a plane in a non-commercial flight loaded with prisoners.  The plane was in the air for approximately five hours and, after landing in upstate New York, Wesam El-Hanafi boarded a prison van for a two hour trip to MCC.  He was therefore shackled and mobile on or about May 24, 2010, for more than eleven hours, and was in heavy pain by the time he arrived at MCC.  The ibuprofen was no longer as effective at reducing the pain as it had been in the beginning.

84. Upon his arrival at MCC, Mr. El-Hanafi expressed complaints and concerns about his pain and suffering and the by now visible lower right ankle and right leg calf condition associated therewith.

85. MCC medical records indicate that on May 24, 2010, Wesam El-Hanafi was given an "intake" examination by defendant Evangelista, C., whose entitled position at MCC is "MLP".  The "intake" examination lasted for roughly twenty (20) minutes.  Mr. El-Hanafi

displayed his leg to defendant Evangelista and expressed his opinion that the condition in his right leg may have been caused by the metal shackles.

86. Mr. Evangelista, noted that the inmate had "alleged" his condition was caused by restraints.

87. Defendant Evangelista apparently determined that Wesam El-Hanafi had no serious medical issues that required diagnosis and treatment.  Defendant Evangelista failed to refer Wesam El-Hanafi for an examination of his foot/ankle/ leg condition.

88. Defendant Evangelista merely noted that Mr. El-Hanafi's leg condition had "improved" after taking "… meds for the past days…" and prescribed additional ibuprofen.

89. Wesam El-Hanafi never indicated any way to defendant Evangelista that his leg had "improved".  At best, in terms of defendant Evangelista's written report and use of the word "improved", Mr. El-Hanafi may have indicated that the ibuprofen had reduced his pain.

90. In fact, Mr. El-Hanafi's still undiagnosed condition, had deteriorated since he first experienced the stinging sensation.  The stinging sensation first appeared more than three weeks prior to defendant Evangelista's intake examination, as Mr. El-Hanafi deplaned following eleven hours of having his ankle encased in a heavy metal bracelet that jiggled painfully when he moved.

91. In June 2010, Wesam El-Hanafi's ankle began to display signs of swelling.

92. On July 16, 2010, Wesam El-Hanafi had another encounter with MCC clinical personnel. On that date, Mr. El-Hanafi was given another prescription for ibuprofen with two refills of 40 tablets and a prescription for 325 mgs. of aspirin.  The prescription was ordered by defendant Dr. Mark Glover, Clinical Director at MCC, a person that Mr. El-Hanafi would not meet personally until after the long-delayed diagnosis of his DVT condition.

93. A personal encounter with the Clinical Director of MCC would not occur until more than fourteen (14) months had elapsed from the date of the prescription of July 16, 2010.

94. For the balance of 2010, Wesam El-Hanafi's serious medical condition remained undiagnosed and untreated.  Although Mr. El-Hanafi was persistent in filing requests for "sick call", records of his requests are not found in the MCC medical records obtained by counsel.  His right ankle and calf, which had begun to swell in June 2010, continued to evince symptoms and cause increased pain.  In early 2011, the swelling symptom was joined by a new symptom:  discoloration of his right ankle.

95. On February 27, 2011, Wesam El Hanafi submitted a written Request to Staff.  He noted that the condition in his leg had deteriorated.  He provided his layman's opinion, based on observing the discoloration in his swollen leg, that he had several blood clots in his right foot.  He noted in the written request to staff that his leg was beginning to become dark grey, almost black.  He informed the MCC staff that walking was very painful for him and closed by saying he needed to see a doctor ASAP.

96. The 2.27.11 Request to Staff was apparently reviewed by defendant Tonya Cooper on March 1, 2011.  Defendant Cooper scheduled Wesam El-Hanafi for a "sick call" on March 11, 2011.

97. Wesam El-Hanafi wrote a second Request to Staff which reproduced the information in paragraph 98 above.  Again, defendant Tonya Cooper apparently retrieved Mr. El-Hanafi's "cop out" from the "box" into which such requests are placed at MCC.

98. Despite the virtual identity of the information included in this second request for examination and diagnosis, defendant Cooper did not schedule the "sick call" appointment for the same day—March 11, 2011—as she had the first request.  Instead, Mr. El-Hanafi is not marked down to appear on this second Request (again, filed the same day as the first and earlier request) until March 30, 2011.

99. Wesam El-Hanafi, who asked in both Requests to Staff to be seen "… by a doctor ASAP…", appeared for both the March 11, 2011, appointment and the March 30, 2011, appointment.

100. On March 11, 2011, Wesam El-Hanafi met with defendant Ramos, E., MLP.  The condition of his leg, despite the swelling and discoloration noted in Mr. El-Hanafi's Request, is indicated to be "Temporary/Acute" by defendant Ramos.  Detail is provided that Mr. El-Hanafi complained of right ankle leg and popliteal fossa pain.

101. The conversation between Wesam El-Hanafi and defendant Ramos on March 11, 2011, included defendant Ramos's speculation that, upon observing the swollen and discolored ankle, "it's probably arthritis".  Wesam El-Hanafi objected to this interpretation and questioned defendant Ramos's judgment since, Mr. El-Hanafi opined, "… the swelling and discoloration are only in one foot … if your speculation of arthritis is accurate as to my swollen right foot then does it not stand to reason that my left foot should also be swollen… " ?

102. Defendant Ramos suggested an x-ray study be scheduled and, again, Mr. El-Hanafi objected.  Mr. El-Hanafi insisted that x-rays determine diseases within bones rather than swelling and discoloration in the foot area.  Mr. El-Hanafi pointed out that he had no pain in his bones, but rather in his swollen and discolored foot.

103. Defendant Ramos, after viewing the swollen and discolored ankle -- despite Mr. El-Hanafi's express written request to be examined by a physician and his written statement of he was experiencing difficulty in walking—negligently, recklessly and with deliberate indifference made no referral for examination or diagnosis by either an MCC doctor or an outside specialist.

104. Defendant Ramos deliberately ignored Mr. El-Hanafi's layman's opinion—later born out as correct by outside specialists' diagnosis of DVT on 10.04.11—that the swollen and discoloration suggested to Wesam El-Hanafi, a layman, that he was suffering from undiagnosed and untreated blood clots.

105. Instead, defendant Ramos scheduled an x-ray study.

106. On March 30, 2011, Mr. El-Hanafi met with defendant Aboulfateh, A., MLP, at MCC. Mr. El-Hanafi displayed his foot for examination by defendant Aboulfateh. Defendant Aboulfateh had a full opportunity to view the swelling and discoloration of the condition which Mr. El-Hanafi had requested be diagnosed by a physician in his "cop out".

107. Defendant Aboulfateh indicated his own view that the condition was a "… sprain and strain of the Achilles tendon…".

108. Defendant dismissed without comment Wesam El-Hanafi's layman's opinion (which was later supported by the outside specialists' delayed diagnosis of 10.04.11 of DVT), written in El-Hanafi's Request to Staff dated 2.27.11 that "… blood clots developing and veins swollen around ankle…".

109. Defendant Aboulfateh also failed to note in his record of the "sick call" anything which can be reasonably assessed as a medical opinion concerning that "… two veins have turned dark grey in back of [the] knee…".

110. Defendant Aboulfateh was negligent, reckless and deliberately indifferent to Wesam El-Hanafi's serious medical needs in failing to assess those needs with a reasonable degree of accuracy or, if such assessment was beyond his level of understanding as a PA refer

Mr. El-Hanafi to an MCC physician or an outside specialist for an informed assessment by a qualified physician.

111. On May 25, 2011, Wesam El-Hanafi again wrote a Request to Staff seeking assistance with his condition that would, in October 2011, be subject to a belated diagnosis as DVT.  On May 25, 2011, Mr. El-Hanafi informed staff at MCC that his right ankle was swollen, and that the problem had been recurring since his arrest over a year prior and that the ibuprofen and naproxen pain killers were merely temporary in their effectiveness.

112. Again, defendant Cooper handled Wesam El-Hanafi's 5.25.11 request and scheduled him for sick call on 6.08.11 at 12 o'clock PM. There is no notation in the MCC record entitled "Health Problems" that the "sick call" of 6.08.11 ever in fact occurred.

113. In late May or early June 2011, Wesam El-Hanafi's pain in simple walking had become so severe that he was forced to place his weight on his toes whenever he moved about.  At this point in the progression of his undiagnosed DVT condition, the fact that "something was wrong" was clearly observable to anyone who observed Wesam El-Hanafi attempt to walk. He was no longer able to walk in a normal and natural fashion.

114. On June 23, 2011, Wesam El-Hanafi filed another "Request to Staff".  He stated that the inflammation in his right lower extremities still continued, that he experienced pain when standing, that he had finished all the medicine prescribed at MCC for his pain, that he had still not seen a doctor despite filing many prior "cop outs" and he completes the Request with a polite invitation to "please assist".

115. Defendant Julie Small reviewed Mr. El-Hanafi's 6.23.11"cop out" on 6.27.11.  She then scheduled Mr. El-Hanafi for a "sick call" visit on 6.29.11.

116. The "sick call" scheduled for 6.29.11 appears to have been cancelled or, if not cancelled, the name of Wesam El-Hanafi was not on the list posted in the morning for sick call on 6.29.11.

117. On June 29, 2011, Wesam El-Hanafi filed yet another "sick call" request.  He indicated that he was walking only on his toes due to extreme pain and that he needed to see a doctor ASAP.  Mr. El-Hanafi stated that the pain killers were not working and that, in fact, his pain had increased on the prior evening of 6.28.11.  He indicated that he had been sent for X-ray study about three months ago, referring perhaps to the 3.11.11 "sick call" at which

he met with defendant Ramos, E., MLP. Wesam El-Hanafi indicated that he had been dealing with the pain in his right calf and foot since his arrest on April 27, 2010.

118. Defendant Julie Small picked up Mr. El-Hanafi's request dated 6.29.11 and scheduled him for a "sick call" visit on July 6, 2011.

119. There is no indication in the MCC record entitled "Health Problems" indicating that the July 6, 2011, "sick call" scheduled by defendant Small ever in fact occurred.

120. On June 30, 2011 (the day following Wesam El-Hanafi's request dated 6.29.11), Wesam El-Hanafi filed another request for medical attention. He stated that he had not been seen by a federal employee associated with the MCC clinic since two or three months prior. He stated that he was unable to walk or stand and that his problem began approximately fourteen months ago, on or about May 30, 2010.

121. Wesam El-Hanafi's 6.30.11 request was picked up by defendant Julie Small who scheduled a "sick call" visit for 7.06.11.

122. MCC medical records for Wesam El-Hanafi fail to confirm that a "sick call" visit by Wesam El-Hanafi taking place on 7.06.11.

123. Also on June 30, 2011, Wesam El-Hanafi encountered defendant Ramos on the 11th floor of MCC South. Mr. El-Hanafi had been lying on his bunk with his leg on ice when other inmates alerted him to defendant Ramos' presence. Wesam El-Hanafi attempted to show his leg and ankle to defendant Ramos who was on the floor passing out medications. Ramos knew that Mr. El-Hanafi was not on the medication and he therefore determined to re-locate himself and, declining Mr. El-Hanafi's invitation to observe his swollen ankle, moved quickly off the 11th floor and vanished.

124. On July 3 or 4 (actual date of electronic communication is unclear), 2011, Wesam El-Hanafi addressed an "Inmate to Staff Message" to "Associate Warden Operations". He mentions that he had spoken with Warden Suzanne Hastings on July 1, 2011, when she was attending a luncheon at MCC.

125. In this lengthy, printed email, Wesam El-Hanafi covers a portion of his efforts to obtain medical care at MCC. He covers the entire history of his pain and suffering and the failure of MCC even to attempt a diagnosis by scheduling Mr. El-Hanafi for an examination by an MCC physician or an outside medical consultant.

126. In late June or early July 2011, the swelling migrated to the bottom of Wesam El-Hanafi's foot. This circumstance made it impossible for Wesam El-Hanafi to walk at all, including on his toes, without severe pain. The disability of his pain-inspired unusual walking style was visible to all observers at MCC, including government agents of the United States employed by MCC.

127. In the first week of July, on or about July 1, 2011, Wesam El-Hanafi approached MCC warden Suzanne Hastings at a luncheon and informed her of his serious health issues and his difficulty in receiving a diagnosis and treatment at MCC. The warden told C.O. St. John to contact the nurse's office. The nurse's office said they could not take him at that moment.

128. The "lengthy email" referred to above, includes a listing of Wesam El-Hanafi's recent efforts to obtain medical attention at MCC, an agency of the government of the United States under whose custody and control Mr. El-Hanafi, a pre-trial detainee, found himself. It states as follows:

    a.    **Mr. El-Hanafi spoke with an unnamed Lieutenant on the evening shift of 6.28.11. The Lieutenant referred Mr. El-Hanafi to the "Unit Team" (presumably the "unit team" consists of staff in the unit that El-Hanafi was housed in at MCC).**

    b.    **On 6.29.11, Mr. El-Hanafi spoke with C.O. Kennedy. C.O. Kennedy indicated he would inform a nurse about the fact that the pain Mr. El-Hanafi described had recently spread to his foot. The nurse's office, Kennedy told El-Hanafi, would "call him down". When El-Hanafi did not receive word from the nurse's station, he inquired, but received no further information.[2]**

    c.    **On 6.29.11, Wesam El-Hanafi went to his MCC counselor, and was given a BP-8 form which he then completed along with another "sick call" request.**

    d.    **On 6.30.11, Wesam El-Hanafi spoke with defendant Ramos, E., MLP. Ramos refused to look at Mr. El-Hanafi's leg/ankle area. Rather, defendant Ramos merely took Mr. El-Hanafi's name and registration number.**

    e.    **On 6.30.11, Wesam El-Hanafi gave a "cop out" to MCC staff member by the name of Mr. Zee. Mr. Zee indicated to Wesam El-Hanafi that Mr. Zee would deliver the "cop out" to the sick call doctor.**

129. Wesam El-Hanafi sent an "Inmate to Staff Message" on July 14, 2011, indicating that he had seen defendant Evangelista "last week" and again had been given pain killers.

---

[2]    C.O. Kennedy was working the midnight shift on June 29, 2011, when Wesam spoke with him. Later in the morning of 6.29.11, after C.O. Kennedy was off duty, Mr. El-Hanafi asked the new C.O. on the A.M. shift if the nurses had "called him down" as C. O. Kennedy had indicated they would do. The new C.O. replied that no one had called for Wesam El-Hanafi.

Mr. El-Hanafi was supposed to see defendant Evangelista again on 7.13.11.  When
Mr. El-Hanafi checked the list for 7.13.11, he did not find his name.

130. Wesam El-Hanafi was not receiving adequate care for an undiagnosed medical condition
That undiagnosed condition ultimately proved to be Deep Vein Thrombosis (DVT).  DVT,
if a clot migrates from the leg to the lungs and causes a Pulmonary Embolism, is potentially
lethal.

131. During early summer of 2011, Wesam El-Hanafi's criminal attorneys became concerned
about the obvious decline in their client's health.  Those attorneys, Justine Harris and
JaneAnne Murray, informed the United States Attorney's office of their concern about their
client's grave medical condition and his diligent but as yet unsuccessful efforts to obtain a
diagnosis at or outside of MCC.

132. The communication by Wesam El-Hanafi's criminal lawyers with the United States
Attorney's Office virtually coincided with Mr. El-Hanafi's use of the electronic mailing
system at MCC.  His use of this system began with Mr. El-Hanafi's efforts to reach and
inform medical care personnel of the government of his serious, and as of the summer of
2011, still undiagnosed, medical needs.

133. On July 14, 2011, Wesam El-Hanafi sent out an electronic request indicating that he had
seen defendant Evangelista a week ago and that Evangelista had made x-ray arrangements.
Wesam indicated his understanding that he would see defendant Evangelista again on
7.13.11 but that his name was not on the "call out list".

134. On July 17, 2011, Wesam El-Hanafi send an electronic request for medical attention to the
Associate Warden of MCC Operations.  He did not receive a reply.

135. Wesam El-Hanafi filed his next form "cop-out" form on the date of July 18, 2011.  He
indicated that defendant Evangelista had taken an x-ray and dispensed pain-killing
medication to him about two weeks prior to the 7.18.11 "cop-out".  At the time of the
"'sick call" visit, defendant Evangelista indicated to Mr. El-Hanafi that he would have the
x-ray results the following day.  Wesam El-Hanafi stated in the request to staff that he had
not heard from defendant Evangelista since the date of the "sick call" approximately two
weeks prior.  El-Hanafi concluded by requesting a diagnosis of his condition and indicated
that if the staff at MCC did not know how to treat his condition that he would like to be
examined by a specialist.  He stated that "… this has been happening for over a year…".

136. Defendant Julie Small, Health Information Technician at MCC, picked up the 7.18.11 "cop-out". She scheduled a sick call visit for July 27, 2011.

137. On July 19, 2011, Wesam El-Hanafi had a medical conference with Dr. Bussanich and P.A. Mitchell. Dr. Bussanich indicated to Mr. El-Hanafi that more testing needed to be done. Mr. El-Hanafi was told that the tests would be scheduled and he would be notified.

138. In fact, Wesam El-Hanafi was not notified by MCC about his visits to NY Downtown. At least, Mr. El-Hanafi was not notified about the visits to NY Downtown until the approval of the ultrasound by defendant Bussanich was handed to Mr. El-Hanafi on or about October 24, 2011. The approval was handed to Wesam by his counselor C.O. Wingate.

139. On July 23, 2011, Wesam El-Hanafi sent out an electronic request that he either be added to the sick call list or, if MCC did not know how to diagnose and treat his condition, that he be permitted to be examined by a specialist.

140. An MCC "approval" of an outside consult was made by defendant Clinical Director of MCC, Anthony Bussanich on August 16, 2011. Defendant Bussanich approved an ultrasound procedure. The ultrasound study is believed the most common diagnostic tool to determine, *inter alia*, the presence of DVT.

141. After many months of effort by Wesam El-Hanafi to discover the actual cause of his distress, and numerous requests to his custodial agents of the government of the United States at MCC for a valid diagnosis of such cause, an evaluation by outside medical specialists was now pending.

142. Wesam El-Hanafi was not immediately informed of the approval of an orthopedic consult made by an outside specialist at New York Downtown Hospital. He was alerted to the approval, made by defendant Glover, by the office of his criminal attorney, Colson & Harris.

143. On September 23, 2011, the actual transport was scheduled for Wesam El-Hanafi, to the New York Downtown Hospital for evaluation by an orthopedic specialist and an ultrasound evaluation of his lower right extremities.

144. On that date, at MCC, due to security procedures in place at MCC, Wesam El-Hanafi was, once again, compelled to accept the pain and potential aggravation to his undiagnosed medical condition, of metal shackles applied to his ankles for the transport. Faced with such a choice, Wesam El-Hanafi denied the transport.

23

145. Immediately after the denial, Wesam El-Hanafi was on the elevator at MCC when he encountered by chance defendant Dr. Bussanich, Clinical Director at MCC.  Mr. El-Hanafi advised Dr. Bussanich of what had just occurred with his decision not to endure the excruciating pain caused by heavy metal shackles applied over his swollen, tender and vulnerable ankle condition.

146. Dr. Bussanich recommended that Wesam El-Hanafi endure the pain and possible aggravation of his medical condition of heavy metal shackles applied directly on top of the swelling.  Mr. El-Hanafi, reluctantly, and against his better judgment, agreed to follow defendant Bussanich's recommendation. The transport was re-scheduled for September 30, 2011.

147. Wesam El-Hanafi was compelled to accept the excruciating pain caused by leg shackles pressing against the precise area of his seventeen-month undiagnosed medical condition, which pain was above and beyond the pain he was already suffering in those areas, even when unshackled, and from which he had been continuously suffering for eighteen (18) months, even though alternative means of security for the transport -- through utilization of a wheelchair and/or soft plastic flexi-cuffs -- were available to agents of the government of the United States.

148. Accordingly, with guarded and reluctant consent, Wesam El-Hanafi was transported with heavy metal shackles bearing against his swollen ankles on September 30, 2011, to nearby New York Downtown Hospital, located roughly three blocks from MCC, and was forced to walk in pain for approximately one block and thereafter through the hospital corridors at New York Downtown Hospital, during which walk the leg shackles unnecessarily inflicted upon Wesam El-Hanafi additional unreasonable, and excruciatingly intense pain above and beyond the intense pain from which he already suffered in his lower right leg/foot/ankle/calf area.

149. Had defendant Bussanich requested that security use plastic flexi-cuffs or make the transport to New York Downtown Hospital, only two blocks away from MCC, utilizing a wheelchair, the potential aggravation of his patient Wesam El-Hanafi's condition, not to mention the gratuitous pain inflicted on his patient, Mr. El-Hanafi, would not have occurred.

24

150. Wesam El-Hanafi was, among other diagnostic procedures which to that point in time agents of the government of the United States had negligently, recklessly and with deliberate indifference failed to utilize and employ to the extraordinary detriment of Wesam El-Hanafi, administered an ultrasound procedure by health care providers at New York Downtown Hospital in and by which it was determined that some, but not yet all, of Wesam El-Hanafi's veins in his right leg/ankle/foot area were blocked.

151. This was precisely the laymans's diagnosis that Wesam El-Hanafi had set forth in his requests for a medical diagnosis as early as February 27, 2011, if not before that date.

152. On or about October 4, 2011, Wesam El-Hanafi received a diagnosis from health care providers at New York Downtown Hospital that he had been suffering from acute Deep Vein Thrombosis (DVT).

153. This long-delayed diagnosis was made according to MCC records more than eighteen months after Wesam El-Hanafi had voluntarily submitted to the custody and control of the government of the United States and was locked and shackled in Dubai on April 27, 2010.

154. The acute nature of the DVT diagnosis was caused by the unnecessary, negligent, reckless and deliberately indifferent delay in a valid medical diagnosis/assessment.  The delay in assessment was the cause of a corresponding delay in treatment.

155. Following the diagnosis of October 4, 2011, Wesam El-Hanafi was started immediately, and for the first time since he had surrendered voluntarily to the custody of the United States, by the outside medical specialists at New York Downtown Hospital, on anticoagulant care with blood-thinning medication.

156. The belated diagnosis of DVT was determined to be caused -- and permitted to endure for more than seventeen months despite Wesam El-Hanafi's persistent requests for a valid medical diagnosis over that period  in the custody and control of agents of the government of the United States -- by Wesam El-Hanafi's enforced immobility during his long distance air transport.  Prior to which and after which such potentially-lethal DVT condition was exacerbated by leg shackles for extended periods of time.

157. Wesam El-Hanafi was held in New York Downtown Hospital until October 4, 2011.  He was shackled with metal clasps around his ankles while in his hospital bed, and hand-cuffed to the bed post.

158.   Wesam El-Hanafi was released, already under care by a treatment regimen of anti-coagulant therapy initiated at New York Downtown Hospital following the long-delayed DVT diagnosis provided for Mr. El-Hanafi by specialists at that institution, on October 4, 2011.

159.   As of the time of the diagnosis by New York Downtown Hospital, the blood clot in Wesam El-Hanafi's right leg could have migrated upwards within the blood vessel in his leg.  Such a progression of the clot toward the lung created the *potentially lethal risk* of pulmonary embolism.

160.   The blood clot had formed because of the failure of agents of the government of the United States to provide Wesam El-Hanafi with adequate medical care, including diagnosis and treatment of his DVT condition, during the period of time and throughout his custodial detention under the control of the government of the United States, including but not limited to  period of time during which Wesam El-Hanafi was detained at the federal Metropolitan Correctional Center facility in New York City.

161.   The DVT diagnosis, the formation of the blood clot, and the migration of the clot was a serious medical condition that was potentially life-threatening to Wesam El-Hanafi

162.   Had the blood clot reached Wesam El-Hanafi's lungs, such progression could have caused Wesam El-Hanafi to suffer a pulmonary embolism and death.

163.   Wesam El-Hanafi learned, for the first time, of the lethal nature of pulmonary embolism from Dr. Erica Wong on September 30, 2011, at the New York Downtown Hospital.

164.   During his hospitalization at New York Downtown Hospital, Wesam El-Hanafi underwent anticoagulation treatment.  He was started on Warfarin (7.5 mg daily) and Lovenox (80 mg q12hr).

165.   Upon his release Dr. Erica Wong of NY Downtown Hospital signed the order on October 4, 2011, as Resident Physician, and ordered that at MCC on October 5, 2011, Wesam El-Hanafi should receive Warfarin 5mg daily with regular checkups for therapeutic INR level of 2.0 – 3.0.  These were the directions given to MCC clinical staff by the outside specialists at NY Downtown Hospital.

166.   Subsequent to the belated referral by MCC for diagnosis at New York Downtown Hospital, Wesam El-Hanafi was returned to MCC where he continued on anticoagulation therapy. The specialists at NY Downtown had ordered that INR levels be assessed at intervals

sufficient to assure the optimum levels of 2.0 to 3.0 were satisfactorily maintained.  For patients who are at a high risk for clot formation, such as Mr. El-Hanafi, the optimum INR levels with proper anticoagulation therapy are generally higher at 2.5 to 3.5.

167.  The follow up by MCC  in monitoring Mr. El-Hanafi's INR levels was not adequate.

168.  On or about October 19, 2011, just two weeks after his return to MCC, Wesam El-Hanafi was rushed back to New York Downtown Hospital when he began coughing up blood and complained of shortness of breath.

169.  Upon Wesam El-Hanafi's return to MCC following the episode of October 19, 2011, his blood INR levels continued to be inadequately monitored.  On November 10, 2011, Mr. El-Hanafi's INR reading was at 1.2.  This low INR reading creates an unacceptable and even a lethal risk of a potential pulmonary embolism for a confirmed DVT patient such as Mr. El-Hanafi.

170.  Such was a reflection of the lack of adequate treatment and care being provided to  Wesam El-Hanafi by the agents of the government of the United States even after the external New York Downtown Hospital evaluation of DVT, which placed those agents of the government of the United States, in whose care Wesam El-Hanafi was entrusted, on notice that Wesam El-Hanafi was at a serious medical risk due to the confirmed DVT condition he suffered from.   The DVT condition was itself a result of negligent, reckless and deliberately indifferent actions and omissions by government agents for the extended period of time in which they were charged with protecting his health and welfare from the outset of his custodial detention by the government of the United States.

## EXHAUSTION of ADMINISTRATIVE REMEDIES

171.  Wesam El-Hanafi has exhausted his administrative remedies with respect to all claims relevant to denial of medical care.

### FIRST CAUSE of ACTION

### DENIAL OF MEDICAL CARE and
### <u>MEDICAL MALPRACTICE</u>
### (Federal Tort Claims Act against the United States of America)

172. Wesam El-Hanafi, plaintiff, repeats and realleges each and every allegation contained in paragraphs 1 through 171 as set forth above.

173. As a result of the fault and negligence of defendant, the United States of America, by and through its agents, servants, employees and specifically the medical personnel at the federal facility at Alexandria, Virginia, the federal transfer facility at Oklahoma City, Oklahoma, and the Metropolitan Correctional Center (MCC-NY) in New York, New York, acting within the scope of their employment, through their acts and omissions, caused a condition of Deep Vein Thrombosis to develop in plaintiff's lower right extremities and to go undiagnosed and untreated for a period of more than seventeen (17) months, resulting in extreme pain and suffering and leaving plaintiff with a permanent disability in such lower extremities on his right side.

174. The acts and omissions of medical personnel at the foregoing institutions, as set forth in paragraphs 1 through 171, constitute medical malpractice in violation of the laws of Virginia, Oklahoma and New York.  In the manner described herein, these medical personnel owed a duty of ordinary care to Mr. El-Hanafi in providing timely diagnosis and treatment of his serious medical condition.

175. Despite Mr. El-Hanafi's repeated requests for diagnosis and treatment, over a period of seventeen (17) months, the diagnosis was not made until he was sent to an outside hospital, New York Downtown Hospital, and diagnosed with an ultrasound procedure on October 4, 2011, as suffering from Deep Vein Thrombosis (DVT).

176. In the manner described herein, these medical personnel breached that duty through repeated incidents of failing to examine, diagnose and treat Mr. El-Hanafi's  serious medical condition.

177. These medical personnel were repeatedly placed on notice by Mr. El-Hanafi's written requests for diagnosis and treatment, and also by Wesam El-Hanafi's inability to walk in a normal and natural fashion as he moved within MCC and the confines of  the other federal

BOP facilities where he was incarcerated, the swelling and discoloration in his foot and ankle, and his use of ice while sleeping to reduce the inflammation in his leg.

178. As a direct and proximate result of the combined negligence of the medical personnel who were responsible for diagnosing and treating Mr. Hanafi's DVT condition while he was a pre-trial detainee in federal custody, he endured extreme pain and suffering. Therefore, and in addition to his temporal pain and suffering, Mr. El-Hanafi became, as a direct and proximate result, disabled, disfigured and suffered an extreme reduction in his potential for gainful employment.

179. Under the Federal Tort Claims Act the defendant United States of America is liable to Mr. El-Hanafi for the unlawful acts and omissions of medical personnel while acting within the scope of their employment as employees of the United States.

## SECOND CAUSE of ACTION

## NEGLIGENCE

180. Mr. El-Hanafi repeats and realleges each and every allegation contained in paragraphs 1 through 171 as set forth above.

181. As a result of the negligence of defendant, the United States of America, by and through its agents, servants, and employees, and specifically members of the Alexandria, Virginia staff, the Oklahoma City staff, and the MCC-NY staff, acting within the scope of their employment, Mr. El-Hanafi experienced extreme pain and suffering and the loss of the normal and natural use of his lower right extremities, to wit, his foot / ankle / leg area.

182. The acts and omissions of staff at the foregoing institutions, while in the scope of their employment, constitute negligence in violation of the laws of Virginia, Oklahoma and New York. The staffs at these institutions owed a duty of delivering ordinary medical care to ensure that he was promptly diagnosed and treated for his serious DVT condition.

183. In a manner described herein, the staff at the foregoing institutions breached their duty to Mr. El-Hanafi by ignoring his persistent requests for medical attention and diagnosis of his condition, refusing to obtain or permit an examination by an actual physician, and permitting the deterioration of such condition until such time as the veins in his legs were totally occluded and the condition became chronic and Mr. El-Hanafi was burdened by a permanent disability, and a reduction in his potential for full employment.

184. The negligent care received by Mr. El-Hanafi caused him to suffer permanent impairment in his mobility as well as extreme pain and suffering, and a reduction in his potential for gainful employment.

185. Under the Federal Tort Claims Act, the defendant United States of America, by and through its agents, the employees at Alexandria, Virginia, Oklahoma City, Oklahoma and MCC-NY in New York, New York, is liable to Mr. El-Hanafi for the unlawful actions of these employees as they were acting within the scope of their employment as physicians and/or physician's assistants and/or medical line technicians.

186. Defendants are also liable by this court's supplemental jurisdiction under the laws of New York, Oklahoma and Virginia for failing to deliver ordinary medical care and for active negligence and negligent omissions and for medical malpractice.

### THIRD CAUSE of ACTION

### NEGLIGENT ENFORCEMENT of EXTRAORDINARY RESTRICTIONS on MOVEMENT during EXTENDED FLIGHT TIME

187. Mr. El-Hanafi repeats and re-alleges each and every allegation contained in paragraphs 1 through 171 set forth above.

188. From the date of his submission to federal custody on April 27, 2010, defendant was a pre-trial detainee subject to security considerations during transit.

189. Security considerations are only one factor taken into account by federal employees charged with monitoring the movement of inmates *in transit* with extended flight times.

190. The risk of contracting clots in the bloodstream is known to be enhanced for individuals who are compelled to endure extended periods of air travel time.  This is due to the unnatural restrictions on their ability to move and permit the natural and healthy blood circulation while in transit.

191. Such risk is a particular threat for parties who have been charged with criminal actions and are forced, due to security considerations, to endure an extended period of travel in an environment defined by limitations of space, such as the interior cabin of an airplane.

192. Security risks under such circumstances must be reasonably balanced against the health risks posed by DVT for individuals who are transferred by air while subject to incarceration.

193.  Hence, the need for such a balance of a prisoner's health and his security while on board an airliner with extended flight times is, or should be, part of the training for security agents whose employment responsibilities causes them to monitor such prisoners while in transit.

194.  This risk is magnified for prisoner's who have spent their time prior boarding a global airliner locked into, as was plaintiff Wesam El-Hanafi in this case, heavy metal shackles.

195.  Wesam El-Hanafi is a person who outwardly exhibits a demeanor of cooperative, polite behavior, even under circumstances of being in the undesirable state of detention, and moreover. the risk of sudden violence or attempted escape by any detainee, from the interior cabin of an airliner travelling high over the earth and international waters, is clearly reduced to a point beyond controversy.

196.  Such facts must be taken into account as part of assessing a reasonable balance between security concerns and protecting the health of a detainee during the course of an international transport by air.

197.  The training of federal agents is believed to include or should include an awareness by such agent trainees that they should always be cognizant of the wide variety of physical settings in which they are called on to enforce security.

198.  The DVT diagnosis made by New York Downtown Hospital on October 4, 2011, sets forth as the cause of Wesam El-Hanafi's distress, the so-called "Economy Class Syndrome" or lack of adequate blood circulation in the lower extremities during extended air time.

199.  Prior to boarding the American Airliner in Dubai, Mr. El-Hanafi had spent the previous days in Dubai moving about in heavy metal shackles from his place of incarceration to different locations to confer with government employees about various matters.

200.  He was then placed on the American airliner and permitted to move from his seat only to visit the bathroom or to pray.  Hence, on a flight that endured for sixteen hours counting landing and taking off, Mr. El-Hanafi was permitted to move his legs for only about fifteen minutes out of a total of fourteen (14) hours actual air time.

201.  The persons enforcing this injunction were, *inter alia*,  FBI agents Daniel Withers and "Charlotte" Doe.

202.  Sean Cooper, the Consulate of the United States in Dubai, is the federal employee on whose authority Wesam El-Hanafi was arrested and held in leg irons in a Dubai jail pending a 16-hour transit by air from Dubai to the United States.

203. Cooper, Withers and "Charlotte" Doe are each employees of the government of the United States.

204. DVT, the "Economy Class Syndrome", is a known physical risk posed to charged persons in transit by air who are subjected to extraordinary movement restrictions in flight.

205. As the contraction of DVT is a known risk under these circumstances it either *is* or *should be* a topic covered in the training of Federal agents such as employees of the Federal Bureau of Investigation, as were defendants Daniel Withers and "Charlotte", or employees of the United States Marshalls, who also assisted in securing Wesam El-Hanafi during the flight.

206. Defendant Sean Cooper, as United States Consul for Dubai, either knew or should have known about the need of caution in regard to unnatural restrictions of circulation of blood during flights such as the 16-hour venture on which Wesam El-Hanafi was transported *via* American Airlines on April 27, 2010.

207. Failure to allow sufficient movement during flight time to permit adequate blood circulation was a clear instance of negligence as to defendants Cooper, Withers and "Charlotte", and a violation of the duty of ordinary care and/or the use of what amounted to excessive force in curtailing Wesam El-Hanafi's normal and natural need for movement and the healthy promotion of adequate blood circulation during an international airline transit of such lengthy duration, for each of these defendants under the laws of Virginia, Oklahoma and New York.

## FOURTH CAUSE of ACTION

## NEGLIGENT INFLICTION of EMOTIONAL DISTRESS

208. Mr. El-Hanafi repeats and realleges each and every allegation contained in paragraphs 1 through 171 as set forth above.

209. The acts and omissions of the defendant United States of America, by and through its agents, servants and employees, and specifically the members of the Alexandria, Oklahoma City and MCC-NY staffs, as set forth in paragraphs 1through 171 constitute negligent infliction of emotional distress in violation of the laws of Virginia, Oklahoma and New York.  The staff at the forgoing institutions had a duty to provide ordinary care to

Mr. El-Hanafi and insure that examination, diagnosis and treatment were administered according to a medical standard of ordinary care.

210. In the manner described herein, the staff at the foregoing institutions breached that duty by repeatedly failing to respond to Wesam El-Hanafi's written and verbal requests to be examined, diagnosed and treated, and negligently disregarding Mr. El-Hanafi's clear, visible, obvious and serious medical needs.

211. The staff at the foregoing institutions repeatedly were put on notice by Wesam El-Hanafi himself and otherwise that he required examination, diagnosis and treatment, and that he was not receiving same.  Rather, Wesam El-Hanafi received mere speculations (such as a "cyst", "arthritis" and a rupture of the "Achilles tendon") each of which differed one from the other and none of which was supported by examination or scientific testing.

212. The staff at the foregoing institutions failed to take reasonable steps, when they took *any steps*, despite Wesam El-Hanafi's repeated protestations that pain-killing medications had proven to be ineffective and did not address the actual and true, underlying medical issue from which he suffered.

213. Wesam El-Hanafi, while incarcerated at MCC, filed an "Inmate Request to Staff" in which he indicated his personal layman's view that his condition may have included the development of "blood clots" and noted that "two veins have turned dark grey in back of knee".  Mr. El-Hanafi concluded this request with the statement that he needed to "see a doctor ASAP".  This appeal for help followed many similar appeals for medical assistance was made in the ninth month after beginning his term of incarceration at MCC.

214. The refusal of medical line technicians on staff at MCC, apparently acting as gatekeepers, refused to schedule Mr. El-Hanafi for examination, diagnosis and treatment by a licensed physician, for the extended period of eighteen months, caused Mr. El-Hanafi, as he witnessed the progressive swelling and discoloration in his leg/ankle/calf area, to fear for the maintenance of his physical health.

215. The insistence of security at MCC that Wesam El-Hanafi wear heavy metal shackles which bore down directly on his already swollen and infirm leg/ankle/calf area during the transport to, and the necessity of walking through the corridors of, New York Downtown Hospital, while shackled, which MCC custom went unchallenged by defendant Bussanich, after which, at the orders of MCC security, Wesam El-Hanafi was shackled to his hospital

bed at, within the corridors of and during the transport to New York Downtown Hospital, all of which inflicted gratuitous and unnecessary pain to Mr. El-Hanafi and aggravated his undiagnosed DVT condition.

216. The actions of the MCC medical staff, together with MCC transport security as indicated above, constituted negligence and a breach of their duty to ensure ordinary medical care to pre-trial detainees such as Wesam El-Hanafi.

217. This breach of duty to Mr. El-Hanafi resulted in the negligent infliction of emotional distress in violation of Virginia, Oklahoma and New York law,

218. Under the Federal Tort Claims Act the defendant United States of America is liable to Wesam El-Hanafi for the unlawful acts and omissions of its agents, servants and employees, as they were acting within the scope of their employment as law enforcement officers and employees of the United States.

## FIFTH CAUSE of ACTION

### (*MONELL* CLAIM)

219. Mr. El-Hanafi repeats and re-alleges each and every allegation contained in paragraphs 1 through 171 as set forth above.

220. All 1983 defendants sued in their official capacities the lawsuit is treated as an action against the governmental entity that employs an individual defendant.

221. When the federal government took Wesam El-Hanafi into its custody and thereby restrained his personal liberty, a duty to protect Wesam El-Hanafi arose under the Fourteenth Amendment and such duty to protect remained under the Eighth Amendment after such time as Mr. El-Hanafi elected to enter a plea to any still-outstanding criminal charge.

222. A *Monell* claim or its procedural equivalent is attached herein as an additional claim against defendant the United States of America under the FTCA where federal employees acquiesced in customs, practices and policies which, as to plaintiff Wesam El-Hanafi, resulted in the negligent denial of ordinary medical care to Wesam El-Hanafi. Such a *Monell* claim is based on the inadequate hiring policies, failure to discipline and to train the federal government employees within the BOP and, specifically, within MCC/NY, and also as to the other party defendants, named and unnamed, as captioned in this case.

223. A *Monell* claim is also filed as to the named and unnamed defendant federal employees in the FBI, as captioned, for acquiescing in customs, practices and policies, that resulted in the negligent enforcement of excessive restraints on Wesam El-Hanafi's ability to stretch and move, during the extended air time of sixteen hours, including landing and takeoff, in his transit from Dubai to the United States, and thereby unnecessarily and negligently exposing Mr. El-Hanafi to the known risk of contracting the medical condition of Deep Vein Thrombosis. The enforcement by defendant agents was due to the existence of agency customs, practices and policies which negligently fail to accommodate such known risks, or if the customs and policies in fact are adequate in the consideration of such risks, then, through failure to supervise, train and discipline, and inadequate hiring policies, the named and unnamed defendants were negligent in acquiescing in such customs, practices and policies.

224. *Monell* claims may be included as another claim under a *Bivens* action, such additional claim being the allegations made on the basis of constitutional violations of Wesam El-Hanafi's guarantees under the Fourteenth Amendment, for violations which occurred while Wesam El-Hanafi was a pre-trial detainee and, after he entered a plea to any charge, as to constitutional violations under the Eighth Amendment.

## PRAYER for RELIEF

**WHEREFORE,** Plaintiff Wesam El-Hanafi respectfully requests this Court:

(1)     Enter judgment in favor Plaintiff and against defendants;

(2)     Award Plaintiff compensatory damages, and punitive damages, if applicable, in

an amount to be determined at trial;

(3)     Grant Plaintiff an award of attorney fees and other litigation costs reasonably

incurred in this action;

(4)     Grant Plaintiff such other relief as the court deems just and proper.

_____

**Jake Harper,** Attorney for Plaintiff
240 West 73rd Street, # 811
New York, New York  10023
**TEL:  (212) 406–2606**
**FAX:  (212) 496-1846**
**Email:  jakeharper3@gmail.com**