UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

                               :

WESAM EL-HANAFI,                       :

                               :

                    Plaintiff,    :        1:13-cv-2072-GHW

                               :

        -against-            :      OPINION AND ORDER

                               :

UNITED STATES OF AMERICA, ET AL.,    :

                               :

                   Defendants.   :

                               :

------------------------------------------------------------------ X

**GREGORY H. WOODS, District Judge:**

Plaintiff Wesam El-Hanafi is currently an inmate at the Metropolitan Correction Center in New York, New York. He claims that he developed deep vein thrombosis as a result of security restraints and a delay in diagnosis and treatment while he was in federal custody. He brings this action asserting negligence claims under the Federal Tort Claims Act and Eighth and Fourteenth Amendment claims under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). The United States and its individual federal employees now move to partially dismiss the Complaint for lack of subject matter jurisdiction and for the failure to state a claim.[1] The Court finds that plaintiff is barred from suing the United States for the acts of its employees arising abroad, the acts of private contractors, and acts within the government's discretion. With respect to plaintiff's *Bivens* claims, the Court finds that El-Hanafi fails to allege that the individual federal defendants violated his constitutional rights. Accordingly, defendants' partial motion to dismiss is GRANTED in its entirety.

---

[1] Dkt. 28. On August 22, 2014, the Court granted the motion to dismiss filed by defendants Conmed Healthcare Management, Inc., Correct Care Solutions, and their employees – private contractors with the federal government. Dkt. 56.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 01/06/15

## I.    BACKGROUND

### A.    Facts[2]

#### 1.    Transfer to United States Custody

Plaintiff Wesam El-Hanafi submitted to federal custody on April 27, 2010.  Third Amended

Complaint ("Compl."), ¶ 30.  He was 34 years old and in good health at the time.  *Id.* ¶¶ 24-25.

During his three-day detention by the police in Abu Dhabi at the direction of defendant Sean

Cooper, an official at the United States consulate there, El-Hanafi was allowed to move his legs for

only brief periods of time.  *Id.* ¶¶ 31-32, 37, 211.  On April 30, 2010, El-Hanafi was flown on an

American Airlines flight to Washington, D.C., accompanied by FBI agents Daniel Withers and

Charlotte Ryder.  *Id.* ¶ 52.  During the 16-hour flight, while El-Hanafi was not physically restrained,

he was "discouraged from the normal and regular use of his legs," "constrained in his ability to

move about," and therefore "essentially denied the opportunity to move and stretch his legs in a

normal and natural fashion," except for one fifteen-minute break to use the bathroom and pray.  *Id.*

¶¶ 51, 54.

Upon his arrival at Dulles International Airport, El-Hanafi noticed, "for the first time, a

stinging sensation in his right calf."  *Id.* ¶ 56.  El-Hanafi was then formally arrested and arraigned.

*Id.* ¶ 57.  Following the arraignment, El-Hanafi "remained in the custody and control" of the United

States and was subsequently held for eleven days at the Alexandria Detention Center in Alexandria,

Virginia, which he states was "medically staffed by either [Conmed or CCS], private contractors with

the federal [Bureau of Prisons], an agency within the executive branch of the government of the

United States."  *Id.* ¶¶ 60, 61.  There he remained for eleven days, during which time he complained

---

[2] The facts summarized herein are drawn from plaintiff's Third Amended Complaint ("Complaint" or "Compl."), Dkt. 20.  For purposes of a motion to dismiss, the Court accepts all factual allegations in the complaint as true.  *See ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

to the medical staff about the pain in his leg, and was prescribed ibuprofen.  *Id.* ¶¶ 67-70.

> 2.   Transfer to BOP Facilities

On May 11, 2010, El-Hanafi was transferred to the Federal Transfer Center in Oklahoma City, Oklahoma.  *Id.* ¶ 71.  For the entire fifteen-hour trip, including four hours in a bullpen, five hours in a prison van, and a four-to-five hour flight, El-Hanafi was fully restrained by metal leg shackles and wrist cuffs, and his hands and legs were tied off with a wristband, which severely limited his ability to move.  *Id.* ¶ 72.  The leg shackles caused him continuous, intense pain in his right ankle and calf.  *Id.* ¶¶ 74-75.  The morning after his arrival at the prison, El-Hanafi attended "sick call" and was given ibuprofen but nothing more, despite having told federal agents that ibuprofen had previously failed to lessen his pain and that his condition had only worsened.  *Id.* ¶¶ 76, 79.  He was also seen by a physician's assistant and a doctor; the doctor informed him that he might have an inflamed cyst in his leg, but did not recommend further tests.  *Id.* ¶¶ 79-80.

On May 24, 2010, El-Hanafi was transported to the Metropolitan Correction Center in New York, New York ("MCC").  *Id.* ¶ 82.  The trip lasted over eleven hours, including five hours of flight time, during which El-Hanafi was restrained in heavy metal ankle shackles that jiggled painfully when he moved.  *Id.* ¶¶ 83, 90.  He experienced a stinging sensation upon deplaning and was in "heavy pain by the time he arrived at the MCC."  *Id.*  ¶ 83.

> 3.   Medical Condition and Care at the MCC

Upon his arrival at the MCC, El-Hanafi complained about the pain in his lower right ankle and calf.  *Id.* ¶ 84.  Medical records indicate that on May 24, 2010, he was given an "intake" examination by defendant Chito Evangelista, a Mid-Level Practitioner at the MCC.  *Id.* ¶ 85.  El-Hanafi showed Evangelista his leg and expressed his belief that the condition had been caused by being forced to wear heavy metal shackles.  *Id.* ¶ 85.  He also states that he may have told Evangelista that the ibuprofen had reduced his pain.  *Id.* ¶ 89.  Evangelista's notes indicate

Evangelista's view that El-Hanafi had no serious medical issues that required diagnosis or treatment and that his leg condition had improved after taking meds for the previous few days. *Id.* ¶¶ 87-88. Evangelista prescribed ibuprofen but did not order further examination. *Id.*

El-Hanafi's left ankle began to display signs of swelling in June 2010. *Id.* ¶ 91. In July 2010, he saw MCC clinical director Dr. Glover, who prescribed him ibuprofen and aspirin. *Id.* ¶ 92. He claims that for the balance of 2010, he was persistent in filing requests to be seen at "sick call" for his painful and swollen right ankle, *id.* ¶ 94, but does not provide further details of those requests and what responses, if any, they engendered.

On February 27, 2011, El-Hanafi submitted two written "Requests to Staff," noting that his leg condition had deteriorated, he believed he had several blood clots in his right foot and a swollen vein by his right ankle, two veins in his legs had become dark grey and almost black, and walking was very painful for him. *Id.* ¶ 95. He asked to see a doctor "ASAP." *Id.*; *see also* Compl. Exh. A-1. Nurse Tonya Cooper, one of the defendants in this action, reviewed the requests and scheduled El-Hanafi for a "sick call" on March 11, 2011 and March 30, 2011. *Id.* ¶¶ 96-98. At those March appointments, El-Hanafi was seen by MCC Mid-Level Practitioners Erwin Ramos and Atef Aboulfateh, respectively. *Id.* ¶¶ 99-110. El-Hanafi claims that Ramos failed to refer him to an outside specialist, and that both Ramos and Aboulfateh failed to diagnose his condition as deep vein thrombosis ("DVT"). Rather, Ramos described El-Hanafi's condition as "Temporary/Acute" in his notes, suggested that El-Hanafi had arthritis, and ordered an x-ray, allegedly ignoring El-Hanafi's protests that it might be something more serious. *Id.* ¶¶ 100-105. El-Hanafi received this x-ray on an unspecified date. *Id.* ¶ 129. Aboulfateh attributed El-Hanafi's condition to a "sprain and strain of the Achilles tendon," allegedly failing to take into account El-Hanafi's discolored and swollen veins and El-Hanafi's opinion that he had blood clots. *Id.* ¶¶ 106-110.

El-Hanafi submitted additional requests to MCC staff on May 25, June 23, June 29, and June

30, 2011. *Id.* ¶¶ 111-21. By that time, the pain prevented him from walking normally, and he states

that it was clearly observable to anyone that "something was wrong." *Id.* ¶ 113. He also states that

his painkillers were not working, and that his pain had recently increased. *Id.* ¶ 117. He points out

that although the May 25 and June 23 forms reflect that a nurse scheduled him to be seen at sick call

on June 8, 2011, and that defendant Julie Small scheduled him for a June 29, 2011 sick call, the

records do not indicate that either of these appointments took place. *Id.* ¶¶ 112, 116.

The June 29 and 30 requests resulted in an appointment during the week of July 4, 2011, at

which Evangelista administered an x-ray and dispensed pain-killing medication to El-Hanafi. *Id.* ¶

130, 134, 136. Evangelista also told him to expect x-ray results the following day. *Id.* On July 14,

2011, El-Hanafi sent an "Inmate to Staff Message" asking to see a specialist, and indicating that for

the past 14 months the staff had been unable to diagnose or treat his condition. *Id.* ¶ 130. He also

stated that he had not heard from Evangelista since his last appointment. *Id.* ¶ 136. El-Hanafi

continued to submit requests for medical care on July 17, 18, and 23, 2011, still not having heard

from Evangelista regarding the x-ray results. *Id.* ¶¶ 129-131, 134-146, 140.

El-Hanafi also alleges that around this time, he was denied relief through other informal

encounters. For example, he says that Ramos declined to treat him while distributing medications to

other prisoners on June 30, 2011. *Id.* ¶¶ 123, 128. He also says that he spoke to Warden Hastings

on July 1, 2011, and that she directed an MCC officer to contact the nurse's office, which was unable

to see him that day. *Id.* ¶ 127. He says he also spoke with various MCC officers between June 28

and 30, 2011, and that he sent an email to the staff on July 3 or 4, 2011 detailing those encounters.

*Id.* ¶ 128.

Nurse Small scheduled El-Hanafi for an appointment on July 27, 2011 with defendant Dr.

Anthony Bussanich, the MCC clinical director, and T. Mitchell, a physician's assistant. *Id.* ¶¶ 136-38.

Dr. Bussanich told El-Hanafi that more testing needed to be done, that these tests would be

scheduled, and that El-Hanafi would be notified.  *Id.* ¶ 138.

On August 16, 2011, El-Hanafi was approved for ultrasound testing to take place on September 23, 2011.  *Id.* ¶¶ 141, 143.  However, when that day arrived, El-Hanafi declined to go because MCC security procedures required him to submit to leg shackles for transport to the hospital.  *Id.*  ¶¶ 144.  In the elevator afterward, he ran into Dr. Bussanich, and explained to him what had happened.  Dr. Bussanich recommended that El-Hanafi submit to the shackles in order to undergo testing.  *Id.* ¶¶ 146-46.  El-Hanafi reluctantly agreed to do so, and the testing was rescheduled for September 30, 2011.  On that day, he was transported to the hospital with heavy metal shackles around his swollen ankles, causing him "additional unreasonable, and excruciatingly intense pain above and beyond the intense pain he already suffered in his lower right leg/foot/calf/ankle area."  *Id.* ¶¶ 146-48.

El-Hanafi was treated at New York Downtown Hospital from September 30 to October 4, 2011, during which time he was shackled with metal clasps around his ankles while in his hospital bed and handcuffed to the bed post.  *Id.* ¶¶ 150, 152.  The hospital performed a venous duplex of El-Hanafi's lower extremities, finding that some of the veins in his right leg, ankle, and foot area were blocked, and that he had been suffering from DVT.  *Id.* ¶¶ 150-52.  He was informed by a doctor that the blood clot in his right leg could have migrated upwards toward his lung, creating a potentially lethal risk of pulmonary embolism.  *Id.* ¶¶ 159, 162-63.

On October 4, 2011, El-Hanafi was released from the hospital under a treatment regimen of anti-coagulant therapy.  *Id.* ¶ 158.  After his return to the MCC, he claims that his blood level was inadequately monitored, and that as a result, he was re-hospitalized on October 19, 2011 after his blood medication became sub-therapeutic and he began coughing up blood and experienced trouble breathing.  *Id.* ¶¶ 167-69.

El-Hanafi claims that the compression socks ordered for him in December 2011 did not fit

properly.  *Id.* ¶ 174.  He requested replacement socks on January 12, 2012, referring to his right leg

pain.  *Id.*; Compl. Exh. D-1.  He also filed requests for medical socks, footwear, and pain remedies

for his right leg on February 13, March 16, and March 19, 2012.  On February 6, 2013, he requested

care for his right leg pain.  By August 10, 2013, his pain had become more localized in his right knee,

and he filed a request for medical care on August 16 and 21, 2013.  On August 30, 2013, he was

taken to Brooklyn Hospital Center for right knee pain.  *Id.* ¶ 172.

**B.      Procedural History**

On March 28, 2013, El-Hanafi commenced this action, culminating in the Third Amended

Complaint filed on February 19, 2014.  He alleges five causes of action:  (1) denial of medical care

and medical malpractice against the United States of America under the Federal Tort Claims Act

("FTCA"); (2) negligence in the delivery of medical care against the United States of America under

the FTCA, and in violation of state law and applicable federal common law against the employees of

the Alexandria Detention Center, the Federal Transfer Center, and the Metropolitan Correction

Center under this Court's supplemental jurisdiction; (3) negligent enforcement of extraordinary

restrictions on movement during the flight from Dubai to the United States in violation of state law

and applicable federal common law against federal agents Daniel Withers, Charlotte Ryder, and Vice

Consul Sean Cooper; (4) negligent infliction of emotional distress against the United States under

the FTCA, and (5) *Bivens* claims for violations of the Eighth and Fourteenth Amendments against

employees of the Alexandria Detention Center, the Federal Transfer Center, and the Metropolitan

Correction Center, as well as federal agents Daniel Withers, Charlotte Ryder, and Vice Consul Sean

Cooper.  *Id.* ¶¶ 180-233.

On March 28, 2014, the United States and the individual federal defendants moved to

partially dismiss the Complaint against them under Federal Rules of Civil Procedure 12(b)(1) and

12(b)(6).[3]  Dkt. 28-35.  Specifically, the defendants sought dismissal of the Third and Fifth Causes

of Action against them in their entirety, and to narrow the scope of the FTCA claims underlying the

First, Second, and Fourth Causes of Action to limit them to FTCA claims against the United States

regarding El-Hanafi's medical treatment.  *See* Dkt. 29 ("Def. Br.").  On June 6, 2014, El-Hanafi

submitted his opposition to defendants' motion to dismiss.  Dkt. 52 ("Pl. Br.").  Dkt. 52 ("Pl. Br.").

On June 20, 2014, the federal defendants submitted a reply brief.  Dkt. 52 ("Def. Rep. Br.").  On

August 22, 2014, the Court granted the April 14, 2014 motion to dismiss filed by Conmed and CCS,

Dkt. 56, leaving only the United States and its individual federal employees as defendants in this

case.

## II.     STANDARD OF REVIEW

### A.      Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under 12(b)(1) when the

district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*,

201 F.3d 110, 113 (2d Cir. 2000).  A plaintiff must prove subject matter jurisdiction by a

preponderance of the evidence.  *Id.* (citation omitted).  And "[w]hile it is generally true that

[m]otions to dismiss for [lack of] subject matter jurisdiction under Rule 12(b)(1) are reviewed under

the same standards as motions to dismiss for failure to state a claim under Rule 12(b)(6), which

requires a court [to] take the facts as alleged in the complaint to be true, and [ ] draw all reasonable

inferences from those facts in favor of the plaintiff," where "the jurisdictional challenge is based on

the FTCA, the government receives the benefit of any ambiguities."  *Loew v. U.S. Postal Serv.*, No. 03

Civ. 5244, 2007 WL 2782768, at *4 (E.D.N.Y. Feb. 9, 2007) (internal quotations and citations

omitted).  Finally, a court may refer to evidence outside the pleadings in deciding a 12(b)(1) motion,

---

[3] Although counsel neglected to move to dismiss on behalf of its client, defendant MCC nurse Tonya Cooper, the Court *sua sponte* assesses the claims against her in this Opinion.

such as affidavits. *See Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

### B.    Rule 12(b)(6)

Pursuant to Rule 12(b)(6), a plaintiff's complaint must be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (quoting Fed. R. Civ. P. 8(a)(2)). While "detailed factual allegations" are not required, the complaint must advance more than "labels or conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the moving party, "then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 663-64. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting and citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In applying these principles, the Court may consider facts alleged in the complaint and documents attached to it or incorporated by reference. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152-53 (2d Cir. 2002) (internal quotation marks and citation omitted). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies

heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Id.* (internal citation omitted).

## III.   FTCA CLAIMS

### A.   FTCA Claims Against Individual Federal Defendants

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). The FTCA contains an express waiver of the United States' sovereign immunity for claims arising out of torts committed by its federal employees. *See Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 217-18 (2008) (citing 28 U.S.C. § 1346(b)(1)). Specifically, the FTCA permits claims against the United States for money damages for personal injury "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[4] 28 U.S.C. § 1346(b)(1). Moreover, an FTCA suit against the United States is the "*exclusive* remedy for nonconstitutional torts by a government employee acting within the scope of his employment . . . ." *Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994) (emphasis added).

Accordingly, to the extent that El-Hanafi's FTCA claims for the denial of medical care and medical malpractice (first cause of action), negligence for failure to deliver ordinary medical care (second cause of action), and negligent infliction of emotional distress by failing to respond to his requests for treatment and negligently ignoring or disregarding his medical needs (fourth cause of action) are asserted against the individual federal defendants in this action, those claims are dismissed.

---

[4] 28 U.S.C. § 2671 defines the term "employee of the government" to include "officers or employees of any federal agency" and "persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation . . . ."

**B.      Related State Law and Federal Common Law Claims Against the Individual Federal Defendants**

The United States is the only proper defendant with respect to a negligence claim arising from a tort committed by an individual federal employee, so long as the employee was acting within the scope of his employment.  28 U.S.C. § 2679(b)(1).  Here, El-Hanafi does not allege that the responsibilities of Cooper, Withers, and Ryder did not include the detention, transport, and restraint of arrestees or that they were otherwise acting outside the scope of their employment.  Thus, regardless of whether their decision to verbally discourage El-Hanafi from getting up from his seat, save for a 15-minute break, was somehow negligent or otherwise wrongful, because the defendants acted within the scope of their employment, they are immune from suit on El-Hanafi's common law tort claims.  *See Rivera v. United States*, 928 F.2d 592, 608-09 (2d Cir. 1991) ("Here it is clear that the individual defendants were law enforcement officers and that their jobs included the investigation of narcotics trafficking and the execution of federal search warrants.  Plainly, therefore, whether or not in the course of so doing they performed wrongful acts, such as entering unannounced to execute the warrants or using excessively intrusive means of executing the warrants, the execution of the warrants was nonetheless within the scope of their employment.  Accordingly, under § 2679, the individual defendants are immune from suit on plaintiffs' claims of common-law tort.").  Thus, the third cause of action is dismissed against the individual federal defendants.

El-Hanafi also brings a claim for negligence for failure to deliver ordinary medical care in violation of state law and federal common law (second cause of action) pursuant to this Court's supplemental jurisdiction.  However, again because El-Hanafi does not assert that the individual federal defendants were acting outside the scope of their employment when they administered his medical care, those defendants are immune from suit for that common law tort.  *See id.*  Accordingly, the second cause of action is dismissed against the individual federal defendants.

**C.      FTCA Claims Based on the "Negligent Discouragement of Movement"**

Although plaintiff appears to assert a claim based on the negligent discouragement of movement (third cause of action) against individual defendants Withers, Ryder, and Cooper, and not against the United States under the FTCA, as discussed above, the only proper defendant with respect to such a claim is the United States.  28 U.S.C. § 2679(b)(1).  The Court thus considers whether it has jurisdiction over the United States under a Rule 12(b)(1) standard.

El-Hanafi claims that Withers and Ryder negligently caused him to contract DVT by discouraging him from moving his legs during a fourteen-hour American Airlines flight from Dubai to the United States.  *See* Compl. ¶¶ 209-10.  Defendants argue that their conduct falls within the "discretionary function" exception to the FTCA, precluding this Court's jurisdiction over that claim.

While a district court must accept all factual allegations in a complaint as true when adjudicating a motion to dismiss under Rule 12(b)(6), "in adjudicating a motion to dismiss for lack of subject-matter jurisdiction pursuant Rule 12(b)(1), a district court may resolve disputed factual issues by reference to evidence outside the pleadings, including affidavits." *State Employees Bargaining Agent Coal. v. Rowland,* 494 F.3d 71, 77, n.4 (2d Cir. 2007) (citations omitted).  Here, defendants submit the Declaration of Raymond J. Flannagan, a Supervisory Special Agent assigned to the Physical Training Unit, Training Division of the FBI.  *See* Flannagan Decl. ¶ 1.  The Court properly considers that declaration in deciding defendants' 12(b)(1) motion on this claim.  *Rowland*, 494 F.3d at 77, n.4.

The FTCA's "discretionary function" exception to the federal government's limited waiver of sovereign immunity bars liability for "any claim . . . based upon the exercise or performance of the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).  If a claim falls within this exception, a court lacks jurisdiction to entertain the claim.

To determine whether a federal employee's conduct is protected under the discretionary function exception, courts employ the Berkovitz-Gaubert test. *Fazi v. United States,* 935 F.2d 535, 538 (2d Cir. 1991) (citing *United States v. Gaubert,* 499 U.S. 315 (1991) and *Berkovitz v. United States,* 486 U.S. 531 (1988)). Under that test, if the regulation at issue "is not sufficiently specific to control the conduct in question . . . or is not mandatory, there is room for discretion." *Id.* (citing *Gaubert,* 499 U.S. at 328). As the Supreme Court explained in *Gaubert*:

> . . . if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

499 U.S. at 324. The Court further explained that a discretionary act is one that "involves choice or judgment" and requires the officers' judgment "as to which of a range of permissible courses is the wisest." *Id.* at 335. On the other hand, if a regulation specifically mandates particular conduct, the discretionary function exception does not bar the claim, "because there is no room for choice and the action will be contrary to policy." *Gaubert,* 499 U.S. at 324. The issue, then, is whether the FBI agents' decision regarding the use of restraints on El-Hanafi was discretionary.

In his declaration, Flannagan explains that "[d]ecisions regarding what constitutes reasonable and appropriate restraint of an arrestee are largely discretionary and always dependent on the circumstances at hand," and that "[a]s a general matter, FBI policy explicitly commits the decision to use restraints, such as handcuffs or shackles, to an agent's discretion, to 'employ sound judgment under the circumstances in the use of these devices' with 'any doubt' being resolved in favor of the use of restraints." Flannagan Decl. ¶ 5 (quoting Legal Handbook for Special Agents section 3-63 ("Restraining Devices") (attached as Exhibit A)). This includes consideration of factors such as the detainee's charges and the seriousness of the punishment for such charges. *Id.* ¶ 8. Flannagan further points out that transporting detainees is a responsibility that requires the agent to consider the safety risks to himself, the detainee, and members of the public, "including those who may be in

13

close proximity to the detainee but not be aware of the detainee's status as a detainee." *Id.* ¶ 8. Affording agents this discretion also gives the United States "greater flexibility in being able to use commercial flights to transport detainees." *Id.* ¶ 10. Furthermore, Flannagan states that there is no mandatory federal statute, regulation, or policy that dictates the nature and extent of the restraint to be used in the circumstances at issue here. *Id.* ¶ 7. The declaration establishes that the agents' decision as to which restraints are appropriate is one that "involves choice or judgment" regarding "which of a range of permissible courses is the wisest." As a result, it falls within the FTCA discretionary function exception. *Gaubert*, 935 F.2d at 335. Accordingly, defendants' motion to dismiss is granted with respect to the FTCA claim against the United States for negligent restriction of movement during El-Hanafi's flight from Dubai to the United States.

### D.     FTCA Claims Against U.S. for Actions Abroad

As a part of his third cause of action, El-Hanafi claims that Sean Cooper, the Vice Consul of United States embassy in the United Arab Emirates, ordered his arrest by the Abu Dhabi police and controlled the conditions of his three-day confinement, during which he was held in leg irons and allowed to move his legs for only brief periods of time. Compl. ¶¶ 30-32, 37, 211. Because the FTCA contains an exception for alleged injuries "arising in a foreign country," 28 U.S.C. § 2680(k), to the extent that El-Hanafi brings a claim an FTCA claim against the United States based on his treatment during his time in the United Arab Emirates, that claim is not actionable and must be dismissed. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 (2004) ("We therefore hold that the FTCA's foreign country exception bars all claims based on any injury suffered in a foreign country, regardless of where the tortious act or omission occurred."). The Court notes that El-Hanafi does not challenge the part of federal defendants' motion to narrow the FTCA claim in this manner in his opposition.

### E.     FTCA Claims Against U.S. for Actions of Private Contractors

El-Hanafi asserts FTCA claims for the negligent denial of medical care, medical malpractice, and the negligent infliction of emotional distress relating to his stay at the Alexandria Detention Center, among other federal facilities.  He alleges that the medical providers at the Alexandria Detention Center, which he asserts are the employees of Conmed and CCS, are "private contractors with the federal BOP."  Compl. ¶ 60.

The FTCA expressly excludes private contractors from its definition of "Federal agency," and does not include the employees of private contractors in its definition of an "employee of the government" based upon whose actions the United States may be sued.  *See* 28 U.S.C. § 2671; *Logue v. United States*, 412 U.S. 521, 529-30 (1973).  El-Hanafi does not dispute that Conmed and CCS are private contractors, and he asserts nothing that would transform them into "federal agencies" or their employees into "federal employees" in order to give rise to an FTCA claim against the United States.  It is insufficient that the contract between Conmed, CCS, and the federal government specifies that the medical care provided at the Alexandria Detention Center must "meet the essential standards of the National Commission of Correctional Health Care's Standards for Health Services of Jails."  *See* Lowry Decl. ¶ 7; *Logue*, 412 U.S. at 529-30.  In addition, nowhere does El-Hanafi assert that the United States had any authority to "physically supervise the conduct" of Conmed and CCS employees, who might then be deemed to be "acting on behalf" of the federal government.  *Id.* at 531-32.  Nor is the United States liable under the FTCA for the acts of private contractors "simply because they [were] performing tasks that would otherwise be performed by salaried employees of the government."  *Id.*  Accordingly, El-Hanafi's FTCA claim based on the actions of the employees of private contractors Conmed and CCS during his incarceration at the Alexandria Detention Center is dismissed.  Notably, El-Hanafi does not contest dismissal of this part of the Complaint in his opposition.

**F.**     **FTCA Claims with Regard to the Use of Restraints**

As part of his fourth cause of action for intentional infliction of emotional distress under the FTCA, El-Hanafi claims that the MCC security staff's insistence that he wear metal restraints during (i) his transport to New York Downtown Hospital on September 30, 2011, and (ii) his hospitalization from September 30 to October 4, 2011 exacerbated his DVT by restricting his movement and caused him unnecessary and severe pain.[5]  Compl. ¶¶ 144-49, 157, 225-26.

    1. <u>Use of Restraints During Transport to Outside Hospital</u>

With respect to the first claim, defendants counter that the officers' decision to apply leg restraints during El-Hanafi's transport from the MCC to New York Downtown Hospital was discretionary, and, therefore, falls within the "discretionary function" exception to the FTCA, thereby precluding this Court's jurisdiction.

In support of this argument, defendants submit the Declaration of Mary Wade-Jones, a Special Investigative Agent at the MCC with knowledge of the Bureau of Prison's laws, regulations, policies, and procedures.  *See* Wade-Jones Decl. ¶¶ 1-4.  Wade-Jones states that the decision to apply restraint equipment during the transport of prisoners into the community for medical treatment is discretionary, citing 28 C.F.R. § 570.40 Bureau of Prisons' Program Statement 5538.05, Section 9 of which outlines the staff, weapons, and restraint requirements for escorted trips.  Wade-Jones Decl. ¶¶ 4-5.  That section states, in relevant part, that "[h]andcuffs with martin chains will be used at all times.  Other restraint equipment may be used at the escorting officers' discretion."  *Id.* Exh. A § 9(b)(3).  Wade-Jones further states that there is no mandatory federal statute, regulation or policy that dictates whether leg restraints are to be used in such circumstances.  The policy does specify, however, that "[d]uring unusual medical or 'life-threatening' circumstances, the Warden, after

---

[5] El-Hanafi describes being physically restrained during the fifteen-hour trip from the Alexandria Detention Center to the Federal Transfer Center on May 11, 2010 and the eleven-hour trip from the Federal Transfer Center to the MCC on May 24, 2010 in his Complaint, *see* Compl. ¶ 72-75, but he does not allege any causes of action based on that treatment, nor does he address it in his opposition.  The Court therefore need not address this conduct.

consulting with the Captain and the HSA, will consider all factors concerning the type(s) of restraints that may be necessary to meet the security needs for the inmate," and "balance the inmate security needs with his or her medical requirements," after which the Warden may elect to use alternative security measures, such as reducing the amount of physical restraints, increasing the number of escort staff, or using soft or vinyl restraints. *Id.* Exh. A § 9(b).

Although this internal BOP policy advises the Warden to consider alternative security measures under certain circumstances, at the end of the day, the ultimate decision as to which restraints are appropriate remains entirely within the Warden's discretion, and, indeed, is a classic example of an act that requires the officers' judgment "as to which of a range of permissible courses is the wisest." *Gaubert*, 499 U.S. at 335. Furthermore, the BOP's decision to grant officers discretion in this regard derives from "considerations of public policy," *Berkovitz*, 486 U.S. at 537, such as how best to ensure the safety of the public when transporting prisoners. Accordingly, the government's decision to apply leg restraints during El-Hanafi's transport to the hospital falls within the discretionary function exception to the FTCA, and the motion to dismiss this part of El-Hanafi's FTCA claim is granted.

### 2. Use of Restraints During Hospitalization

El-Hanafi also alleges that he was "shackled with metal clasps around his ankles while in his hospital bed, and handcuffed to the bed post." Compl. ¶¶ 157, 225. He claims that these actions constituted "negligence" and a "breach of [] duty to ensure ordinary medical care to pre-trial detainees" on the part of the MCC security staff, which resulted in the "negligent infliction of emotional distress." *Id.* ¶ 226. Defendants argue that the "leg restraints were applied either as a matter of lawful exercise of discretion or as required by law," i.e. United States Marshals Service ("USMS") policy, Def. Reply at 9; *see also* Def. Br. at 18. Thus, they argue, El-Hanafi "cannot prove negligence because the application of leg restraints was required by law." *Id.* More specifically, they

submit the Declaration of Christine Gelatt "to show that the applicable USMS policy directives" required the security staff "to use leg restraints on El-Hanafi in the circumstances presented." *Id.*

Gelatt is the CFO of United Security Incorporated ("United Security"), which provides security services to federal agencies such as the USMS, including the monitoring of prisoners during medical treatment at medical facilities outside of prison. Gelatt Decl. ¶ 1. United Security personnel were contracted to monitor El-Hanafi during his stay at New York Downtown Hospital from October 1 to October 4, 2011. *Id.* ¶ 3. Gelatt states that "pursuant to United Security's contract with the USMS, United Security employees are required to follow USMS directives on restraints, including for the period that United Security personnel were monitoring plaintiff at New York Downtown Hospital from October 1 to 4, 2011." *Id.* ¶ 4.

As explained above, the FTCA expressly excludes private contractors from its definition of "Federal agency," and it does not include the employees of private contractors in its definition of an "employee of the government" based upon whose actions the United States may be sued. *See* 28 U.S.C. § 2671; *Logue v. United States*, 412 U.S. 521, 529-30 (1973). El-Hanafi does not dispute that United Security is a private contractor, and, as with Conmed and CCS, he asserts nothing that would transform United Security into a "federal agency" or its personnel into "federal employees," giving rise to an FTCA claim against the United States. It is not enough that that the contract between United Security and the federal government required United Security employees to follow federal policy, in this case USMS directives on restraints during the period of El-Hanafi's hospitalization. *See Logue*, 412 U.S. at 529-30. It is also insufficient that United Security was "'acting on behalf of' a federal agency simply because [it was] performing tasks that would otherwise be performed by salaried employees of the Government." *Id.* at 531-32 ("If this were to be the law, the exclusion of contractors from the definition of 'Federal agency' in [Section] 2671 would be virtually meaningless, since it would be a rare situation indeed in which an independent contractor with the Government

would be performing tasks that would not otherwise be performed by salaried Government employees."). Nor does the record show that United Security personnel were subject to governmental supervision and therefore "acting on behalf of" a federal agency. *Id.* Thus, El-Hanafi's FTCA claims relating to the shackling during his hospitalization must be dismissed against the United States. The Court notes that El-Hanafi does not contest dismissal of this part of the Complaint in his opposition.

## IV.   EIGHTH AMENDMENT CLAIMS UNDER *BIVENS*

### A.   Eighth Amendment Right to be Free from Deliberate Indifference to Serious Medical Needs

In order to state an Eighth Amendment claim arising out of inadequate medical care, a prisoner must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This standard includes both an objective and subjective prong. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). First, the prisoner must allege facts showing that the deprivation was objectively sufficiently serious. *Id.* While there is "no settled, precise metric" for determining whether a deprivation is "sufficiently serious," the Supreme Court has noted that a prison official's duty is only to provide reasonable care. *Id.* at 844-47. For example, the Second Circuit has held that "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . while not the only [factors] that might be considered, are without a doubt highly relevant to the inquiry whether a given medical condition is a serious one." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotations and citations omitted).

The subjective prong of the deliberate indifference test is satisfied when an official knew of yet disregarded a substantial risk of harm to the prisoner's health. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). A plaintiff is not required to show that the official acted or failed to act "for the

very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which he could infer that "a substantial risk of serious harm" exists, and that the official in fact drew that inference. *Farmer*, 511 U.S. at 835, 837.   The defendant must subjectively believe the risk of serious harm to be substantial.   In other words, if the defendant establishes that that he or she was aware of the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent," then the defendant is not liable. *Id.* at 844.

The subjective element standard "requires a state of mind that is the equivalent of criminal recklessness . . . ." *Hathaway,* 99 F.3d 550, 553 (2d Cir. 1996).   Thus, mere negligence in misdiagnosing and treating a condition does not violate the Eighth Amendment.   *Farmer,* 511 U.S. at 838 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.").   The Second Circuit has found no constitutional claim where there was "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that the treatment is unreliable, or that the cure is as risky or painful or bad as the malady." *Harrison v. Barkley,* 219 F.3d 132, 139 (2d Cir. 2000).   On the other hand, the Second Circuit has found deliberate indifference where "officials deliberately delayed care as a form of punishment, ignored a life threatening and fast-degenerating condition for three days, or delayed major surgery for over two years." *Demata v. New York State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999) (internal quotations and citations omitted).   Finally, "mere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703.   Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he preferred an alternative treatment, so long as the treatment he received was adequate.   *Id.* (citation omitted).

**B.    Supervisory Liability Under *Bivens***

To establish supervisory liability under *Bivens*, a plaintiff must show that the supervisor was "personally involved" in the constitutional violation by demonstrating that the supervisor:

> (1) participated directly in the alleged constitutional violation, (2) failed to remedy the wrong after being informed of the violation through a report or appeal, (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Following *Iqbal*, which held that "vicarious liability is inapplicable to *Bivens* and § 1983 suits," 556 U.S. at 676, district courts in the Second Circuit are divided as to which of the five *Colon* factors survive. Some district courts have held that only the first and the first part of the third *Colon* factors remain viable. *See, e.g.*, *Bellamy v. Mount Vernon Hospital*, No. 07 Civ. 1801, 2009 WL 1835939, at *4, *6 (S.D.N.Y. June 26, 2009) (holding that the other *Colon* factors "impose the exact types of supervisory liability that *Iqbal* eliminated—situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate."). "The majority of the district courts, however, have held that, absent any contrary directive from the Second Circuit, all five *Colon* factors survive where . . . the constitutional violation at issue does not require a showing of discriminatory intent." *Vazquez-Mentado v. Buitron*, 995 F. Supp. 2d 93, 96-97 (N.D.N.Y. 2014). In *D'Olimpio v. Crisafi*, the court explained that the five *Colon* categories "may still apply as long as they are consistent with the requirements applicable to the particular provision alleged to have been violated." 718 F. Supp. 2d 340, 347 (S.D.N.Y. 2010) (citation omitted). The Second Circuit has yet to rule on the issue. *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014).

Recognizing the split in opinion among the district courts and the fact that the Second Circuit has not squarely addressed the fate of *Colon*, the Court nevertheless declines to weigh in on this point because, as explained below, plaintiff's allegations with respect to supervisory liability are

insufficient to establish "personal involvement," and thus *Bivens* liability, under any of the five *Colon* factors.

### C.      Application

El-Hanafi alleges that employees of the Alexandria Detention Center, Federal Transfer Center, and MCC demonstrated a "deliberate indifference to [his] medical needs," in violation of the Eighth Amendment right to be free from cruel and unusual punishment. Compl. ¶ 232. This liability is premised on both the liability of the line staff and supervisors for their direct acts and omissions, as well as the liability of supervisors for their creation of policies and procedures, inadequate hiring policies, and the failure to discipline and train their employees. *Id.* ¶ 232. For the reasons stated in this Court's August 22, 2014 Opinion and Order, *see* Dkt. 56, the claims against the staff of the Alexandria Detention Center, who were employees of private companies Conmed and CCS, have been dismissed, leaving only the *Bivens* claims against defendant employees of the Federal Transfer Center and the MCC.

El-Hanafi's claim of inadequate medical care essentially boils down to the prison staff's failure to correctly diagnose his DVT throughout 2010 and 2011, resulting in a potentially lethal delay in treatment. El-Hanafi claims that even though his condition deteriorated over time, the staff belatedly referred him to an outside specialist for additional testing and treatment. He also claims that following his diagnosis of DVT, the staff failed to adequately monitor his blood levels, causing him to be re-hospitalized. Because El-Hanafi's condition evolved over time, the Court must consider the objective seriousness of his condition, and each defendant's subjective awareness of that condition, at various points in time.

### 1.      Eighth Amendment Claims Against BOP Clinical Directors

El-Hanafi was incarcerated at the Federal Transfer Center for nearly two weeks in May 2010. Compl. ¶ 71-80. El-Hanafi alleges that Dr. Goforth, the Medical Supervising Clinician there, "had

individual responsibilities for inmate health issues . . . and for the policies, practices and customary management of such issues."  Compl. ¶ 14.  El-Hanafi claims that during transport to the Federal Transfer Center, he experienced "intense pain" in his right ankle and calf.  *Id.* ¶¶ 74-75.  Upon his arrival, he attended "sick call."  He claims he was given ibuprofen but that nothing more was done, despite telling agents that this medication had previously failed to lessen his pain.  *Id.* ¶¶ 76, 79.  He also claims that he was seen by an unnamed physician's assistant and a doctor, who informed him that he might have an inflamed cyst in his leg, but did not recommend further tests.  *Id.* ¶¶ 79-80.  Under *Colon*, El-Hanafi must show that Dr. Goforth was personally involved in the denial of adequate medical care.  Because El-Hanafi does not allege that Dr. Goforth was directly involved in his medical treatment, the Court analyzes Dr. Goforth's potential liability under the remaining *Colon* factors.

El-Hanafi fails to allege facts that support an inference that Dr. Goforth was personally involved in an alleged Eighth Amendment violation under *Colon*.  It is not enough for El-Hanafi to allege that a supervisor was in charge of the employees who provided him medical care.  Rather, El-Hanafi must allege that Dr. Goforth learned about the unconstitutional provision of medical care but did nothing to remedy it, created a custom or policy fostering the unconstitutional provision of medical care or allowed the custom or policy to continue after learning of it, or was grossly negligent in supervising subordinates who provided the allegedly unconstitutional level of medical care.  *See Colon*, 58 F.3d at 873.  El-Hanafi alleges no such facts to support liability against Dr. Goforth under *Colon*.

Similarly, the Complaint is bereft of specific factual allegations to support claims of supervisory liability against MCC Clinical Directors Dr. Glover and Dr. Bussanich under any of the *Colon* factors; rather, El-Hanafi merely alleges that they "had individual responsibilities for inmate health issues . . . and for the policies, practices and customary management of such issues within

their respective facilities."  Compl. ¶ 14.  It is well-established that such conclusory statements

without any supporting factual allegations are insufficient to state a claim.  *See Twombly*, 550 U.S. at

570; *Plair v. City of New York*, 789 F. Supp. 2d 459, 466 (S.D.N.Y. 2011) ("Given 'the general failure

of Plaintiff to plausibly allege that a policy or custom underlay these acts of violence, Plaintiff has

not sufficiently alleged that the violence which harmed him was part of a larger policy or custom at

the [prison].'"); *Davis v. Cnty. of Nassau*, 355 F. Supp. 2d 668, 677 (E.D.N.Y. 2005) ("A complaint

that essentially regurgitates the relevant 'personal involvement' standard, without offering any facts

indicating that, or how, an individual defendant in a supervisory role was personally involved . . .

cannot withstand dismissal.").  Accordingly, the motion to dismiss with respect to Dr. Goforth, Dr.

Glover, and Dr. Bussanich on these grounds is granted.

El-Hanafi's Complaint also faults doctors Goforth, Glover, and Bussanich for inadequate

hiring, discipline, and training of employees, presumably premised on their roles as clinical directors.

Compl. ¶ 232.  Because the Complaint merely alleges this claim in conclusory language without

providing any particular facts to support it—*e.g.* facts going to the directors' actual involvement in

the selection, training, and disciplining of medical personnel, and how this process led to their

subordinates' violations—this claim also fails.  A complaint that essentially restates the relevant

standard for supervisory liability or asserts mere "bald assertions and conclusions of law" must be

dismissed.  *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996); *see also Houghton v. Cardone,* 295 F. Supp. 2d

268, 276 (W.D.N.Y. 2003) (dismissing complaint containing conclusory allegations that county

sheriff "(1) failed to adequately train or supervise the officers; (2) knew about and tolerated the

officers' allegedly unlawful behavior; and (3) failed to institute a proper system of review and

reprimand of his deputies so as to prevent the types of unlawful acts alleged," but offering no factual

basis demonstrating sheriff's personal involvement) (internal quotations omitted). Accordingly, the

claim against Dr. Goforth, Dr. Glover, and Dr. Bussanich on these grounds is dismissed.

El-Hanafi also alleges that Dr. Glover and Dr. Bussanich were directly involved in his medical care. El-Hanafi states that Dr. Glover was directly involved in administering his medical care on at least one occasion—when Dr. Glover prescribed him ibuprofen and aspirin in July 2010, by which point El-Hanafi claims his ankle was not just in pain but had also begun to display signs of swelling. Compl. ¶¶ 91-92. This single incident is insufficient to allege "deliberate indifference" on the part of Dr. Glover. First, the allegations do not demonstrate that El-Hanafi's condition was objectively sufficiently serious at the time he saw Dr. Glover. Though El-Hanafi claims he had pain and swelling in his leg by then, he does not allege that this "significantly affect[ed his] daily activities" or caused "chronic or substantial pain," for example. *Chance,* 143 F.3d at 702-03 (citation omitted).

With respect to the subjective prong, El-Hanafi fails to adequately plead that Dr. Glover knew of, yet disregarded, a substantial risk of harm to El-Hanafi's health. *Id.* at 703. Namely, given El-Hanafi's alleged symptoms at the time, El-Hanafi has not adequately alleged that Dr. Glover failed in his duty to provide reasonable care. In fact, El-Hanafi concedes that he may have indicated to medical personnel in May 2010 that ibuprofen had reduced his pain. Compl. ¶ 89. At the worst, Dr. Glover's course of treatment demonstrates a negligent misdiagnosis, *i.e.* the failure to attribute the pain and swelling—symptoms that could accompany a wide range of afflictions—to DVT. However, a medical professional's "negligen[ce] in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. Accordingly, this claim against Dr. Glover is dismissed.

El-Hanafi alleges that he saw Dr. Bussanich on July 19, 2011, who ordered further testing which was approved on August 16, 2011. Compl. ¶¶ 138, 141. El-Hanafi faults Dr. Bussanich for not notifying him that he had been approved for testing until after the testing had occurred, *id.* ¶¶ 138, 141, but this belated disclosure does not plausibly establish a deprivation of medical care, let

alone a sufficiently serious one.

On September 30, 2014, after El-Hanafi declined to submit to leg shackles in order to be transported to the MCC for the ultrasound, he alleges that he ran into Dr. Bussanich, who advised him to "endure the pain and possible aggravation of his medical condition of heavy metal shackles applied directly on top of the swelling."  Compl. ¶ 146.  Though El-Hanafi reluctantly followed Dr. Bussanich's recommendation, he alleges that Dr. Bussanich should have intervened with respect to the use of alternative security measures in order to accommodate his pain, such as the use of plastic flexicuffs or transport via wheelchair.  *Id.* ¶ 149.  Instead, El-Hanafi was forced to wear the metal shackles while being transported to the hospital, to walk in pain for one block and thereafter through the hospital corridors, during which the shackles "unnecessarily inflicted" upon him "additional unreasonable, excruciatingly intense pain above and beyond the intense pain from which he already suffered in his lower right leg/foot/ankle/calf area."  *Id.* ¶ 148.

El-Hanafi has not plausibly alleged that Dr. Bussanich exhibited a deliberate indifference to the risk of serious harm.   El-Hanafi may have adequately alleged that his condition at the time was objectively serious—the veins in his leg had become dark grey and almost black, walking had become very painful for him (he had to walk on his toes), *id.* ¶ 95, he suffered from blood clots and swelling, *id.* ¶¶ 106-110, and this was all clearly observable to anyone at the time that "something was wrong," *id.* ¶ 113.  *See Chance,* 143 F.3d at 702 (explaining that whether the condition significantly affects daily activities and results in chronic and substantial pain are relevant factors under the objective prong); *Rosario v. Anson,* No. 9:12 Civ. 1506, 2013 WL 5236568, at * 9 (N.D.N.Y. Sept. 17, 2013) (finding that allegations of repeated complaints about chronic swelling, pain and discomfort in the knee were sufficient to satisfy the objective element of a deliberate indifference claim).

El-Hanafi has, however, failed to plead sufficiently that Dr. Bussanich acted with reckless

disregard for his safety and health.  On July 19, 2011, upon seeing El-Hanafi for the first time since

his condition had deteriorated, Dr. Bussanich promptly ordered further testing at an outside

hospital—precisely the measures El-Hanafi argues should have been taken all along.  Compl. ¶ 138.

Though the testing was not approved until August 16, 2011 or scheduled to take place until

September 23, 2014, *id.* ¶ 143, Dr. Bussanich cannot be faulted for this delay.  *See Madera*, 2013 WL

6231799, at *12 ("Courts have also refused to find deliberate indifference where delays in treatment

were caused by circumstances that were outside the control of the charged officials.  The logistical

difficulties involved in scheduling outpatient appointments and transporting prisoners to outside

facilities can present one such circumstance.").  Furthermore, when El-Hanafi encountered Dr.

Bussanich after refusing to submit to security restraints on September 23, 2014, Dr. Bussanich urged

El-Hanafi to go to the hospital for testing.  Compl. ¶¶ 145-46.  Based on these facts, the Court

cannot conclude that Dr. Bussanich acted with reckless disregard for El-Hanafi's well-being; rather,

the facts demonstrate just the opposite—the doctor encouraged El-Hanafi's treatment at a leading

New York hospital.  The motion to dismiss the *Bivens* claim against Dr. Bussanich on this ground is

therefore granted.

2. <u>Eighth Amendment Claims Against BOP Line Staff</u>

El-Hanafi faults MCC Mid-Level Practitioners Chito Evangelista, Atef Aboulfateh, and

Erwin Ramos for allegedly failing to diagnose his DVT.  El-Hanafi claims that at his "intake"

examination upon arrival at the MCC in May 2010, Evangelista incorrectly opined that there were no

serious medical issues that required diagnosis or treatment, and that Evangelista only prescribed him

ibuprofen (although he admits that he may have indicated to Evangelista that the ibuprofen had

helped to reduce his pain).  Compl. ¶¶ 85-89.  Although El-Hanafi alleges that he felt pain at the

time, he did not experience swelling until June 2010, after his intake examination had occurred.  *Id.* ¶

91.  Accordingly, El-Hanafi has not plausibly alleged that his condition at the time was objectively

sufficiently serious, or that Evangelista was subjectively aware of yet disregarded the risk of substantial harm.

The following year, in response to his request for medical care in February 2011, El-Hanafi was seen by Mid-Level Practitioners Ramos and Aboulfateh in March 2011. El-Hanafi noted in his request that he had a swollen vein in his right ankle, two dark grey and almost black veins in his legs, and that walking was very painful for him. *Id.* ¶ 95. He also stated that he believed he had blood clots in this right foot. *Id.* Ramos opined that El-Hanafi had arthritis and ordered an x-ray, while Aboulfateh attributed El-Hanafi's condition to a sprain or strain of the Achilles tendon. *Id.* Although El-Hanafi's condition may have been objectively sufficiently serious at the time, he has failed to allege that Ramos and Aboulfateh were subjectively aware of, yet disregarded, a risk of serious harm. Rather, the Complaint indicates that their responses were reasonable, particularly given the fact that less than a month prior, El-Hanafi had indicated that the ibuprofen had lessened his pain. At most, El-Hanafi has alleged that Ramos and Aboulfateh were negligent in failing to recognize that his symptoms indicated DVT, but this is insufficient to satisfy the subjective prong of the deliberate indifference test. *See Clark v. Swain*, No. 08 Civ. 0637, 2011 WL 6938458, at *3 (W.D.N.Y. Oct. 12, 2011) *report and recommendation adopted sub nom. Clark v. Lay*, No. 08 Civ. 637A, 2012 WL 11128 (W.D.N.Y. Jan. 3, 2012) ("That [defendant's] initial examination did not diagnose plaintiff's injury as a ruptured achilles tendon or cause her to refer plaintiff for immediate transfer to a hospital, is insufficient, without more, to satisfy the subjective element of a claim of deliberate indifference to a serious medical need."). Furthermore, Ramos in fact went a step further and ordered an x-ray, and "prison officials may not be held liable . . . if they responded reasonably to a known risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 826. Accordingly, El-Hanafi has not adequately alleged deliberate indifference on the part of Ramos and Aboulfateh.

By the time El-Hanafi saw Evangelista the week of July 4, 2011, Compl. ¶ 130, 134, his

condition had worsened.  In addition to a possible blood clot, swollen and nearly black veins vein in

his ankle, and the fact that his pain had become "so severe" that he was forced to walk on his toes,

El-Hanafi noted in his requests for medical attention that month that the painkillers had ceased to

work, that his pain had only increased, and that his condition had gone undiagnosed for fourteen

months.  Compl. ¶¶ 113, 117.  Although Evangelista did order an x-ray and prescribe him more

painkillers, *id.* ¶¶ 130, 134, El-Hanafi claims that he never heard back from Evangelista regarding the

x-ray, despite her assurance that he would receive the x-ray results the following day.  *Id.* ¶ 136.  It

was not until he requested medical attention on four more occasions that month, indicating that his

condition had gone undiagnosed for the past fourteenth months and that he needed to see a

specialist, that he was finally referred for outside testing and diagnosed with DVT.  *Id.* ¶¶ 129-131,

134-146, 140.  Although these allegations plausibly establish that El-Hanafi's condition by the time

of his second appointment with Evangelista was objectively sufficiently serious, they do not

adequately allege the subjective prong of deliberate indifference by Evangelista based merely on the

fact that Evangelista did not follow up with El-Hanafi regarding the x-ray results, particularly when

Evangelista responded reasonably by ordering the x-ray and prescribing painkillers in the first place.

El-Hanafi's allegations against nurses Cooper and Small concern their alleged delay in

scheduling El-Hanafi's appointments also fail to state a valid claim.  The Complaint indicates that

each of El-Hanafi's requests for medical attention were met with timely responses.  Cooper

responded to El-Hanafi's two separate February 27, 2011 requests by scheduling him for a "sick

call" on March 11 and March 30, 2011.  Cooper responded to El-Hanafi's May 25, 2011 request by

scheduling him for "sick call" on June 8, 2011.  Small responded to El-Hanafi's June 23, 2011

request by scheduling him for "sick call" on June 29, 2011.  Small again responded to El-Hanafi's

June 29, 2011 request by scheduling him for appointment for the week of July 6, 2011.  And in

response to El-Hanafi's June 30, 2011 request, Small scheduled him for a "sick call" on July 6, 2011.

Even if these responses could be deemed unreasonable delays, a plaintiff must show that the delay caused serious adverse health effects in order to sustain a *Bivens* claim. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003). El-Hanafi fails to allege that the appointments, which each occurred within two weeks of his respective requests, amounted to a delay that caused him serious harm. Therefore, the *Bivens* claims against Cooper and Small are dismissed.

> 3.   Eighth Amendment Claims Against MCC Warden and MCC Supervising Attorney

El-Hanafi holds Warden Hastings liable for her "oversight responsibility as to customs, practices, and policies related to the management of inmates incarcerated at MCC," including inmates' "medical care and physical well-being." As with the same allegation against the clinical directors of the Federal Transfer Center and the MCC, however, a claim that simply restates the legal standard without offering any facts to support it cannot withstand dismissal. *Leeds,* 85 F.3d at 53. El-Hanafi does not allege facts sufficient to hold Warden Hastings liable under any of the *Colon* factors. El-Hanafi has not alleged that Warden Hastings directly participated in his medical care. Nor does he allege any facts to support his claim that Warden Hastings instituted a custom or policy of inadequate medical care that led to the subordinates' constitutional violations, or that she was deliberately indifferent to the risk of serious harm. In fact, El-Hanafi's single specific allegation against Warden Hastings demonstrates quite the opposite—during an informal encounter in July 2011, after El-Hanafi complained to Warden Hastings about his symptoms, she immediately directed an officer to contact the nurse. Compl. ¶ 127; *see Goris v. Breslin,* 402 F. App'x 582, 584 (2d Cir. 2010) (affirming dismissal of case where personal involvement "was limited to the receipt of two letters from [plaintiff], which [defendant] promptly referred to other individuals for investigation and response"); *Farmer*, 511 U.S. at 826 (holding that a prison official cannot be held liable if they "responded reasonably to a known risk, even if the harm ultimately was not averted."). Although the nurse was unable to see El-Hanafi right away, El-Hanafi received medical attention the

following week.  Compl. ¶¶ 127, 136.  These facts do not adequately state a claim of deliberate indifference against Warden Hastings under either the objective or subjective prong; therefore, El-Hanafi's *Bivens* claim against her is dismissed.

El-Hanafi believes Johnson to be liable based on an apparent assumption that Johnson, as Supervising Attorney of the MCC, had "supervisory authority concerning facility policies, practices and customary staff management" relating to inmate health.  Compl. ¶ 13.  This allegation appears to be based on Johnson's position as the MCC Supervising Attorney, and the fact that Johnson allegedly appeared at court conferences related to El-Hanafi's health and has "undertaken tasks" regarding issues raised at those conferences.  *Id.*  However, the only specific fact underlying these allegations against Johnson is the fact that following his DVT diagnosis, Johnson appeared before The Honorable Kimba Wood, the federal judge presiding over El-Hanafi's criminal trial at the time, to discuss El-Hanafi's medical treatment.  *Id.*  However, these facts are insufficient to show that Johnson was involved in El-Hanafi's treatment following the DVT diagnosis.  For example, although El-Hanafi alleges that MCC staff filed to adequately monitor his blood levels following his return from the hospital, allowing it to reach potentially lethal levels, he does not allege any facts that would support a finding of "personal involvement" by Johnson under any of the *Colon* factors.  The *Bivens* claim against Johnson is therefore dismissed.

## V.    FOURTEENTH AMENDMENT CLAIMS UNDER *BIVENS*

El-Hanafi brings a *Bivens* claim against defendants Cooper, Withers and Ryder for their negligent or deliberate indifferent enforcement of excessive restraints on El-Hanafi's ability to stretch and move during the flight from Dubai to the United States on April 30, 2010.  Compl. ¶¶ 43-55, 215.  El-Hanafi also alleges that defendant Cooper should have anticipated the agents' handling of his transport in this manner and intervened to stop it.  *Id.* ¶¶ 8, 32-35, 216.  El-Hanafi further argues that this treatment violated defendants' duty to protect him under the Fourteenth

Amendment's due process clause.  *Id.* ¶¶ 231-32.  El-Hanafi states that he was "discouraged from the normal and regular use of his legs" based on unspecified remarks made to him by Agent Withers, save for one fifteen-minute period to visit the bathroom and pray.  *Id.* ¶¶ 209, 215.

El-Hanafi fails to allege a cognizable claim under the Fourteenth Amendment.  First, as defendants correctly point out, there is "no duty to afford a person being escorted to the United States to face charges of being involved in terrorism the freedom of movement permitted a member of the general public."  Def. Br. at 16.  Furthermore, El-Hanafi concedes that he was not actually physically restrained from moving during the flight; rather, he makes only vague allegations of being "discouraged" from moving.  This is insufficient to state a claim that defendants violated any cognizable duty owed to him under the Fourteenth Amendment.  The *Bivens* claims against Cooper, Withers, or Ryder based on their alleged "negligent discouragement of movement" must be dismissed.

## VI.     CONCLUSION

For the foregoing reasons, the Court grants defendants' partial motion to dismiss in its entirety.  Specifically:

Defendants' motion to dismiss the FTCA claims is GRANTED with respect to:

- the denial of medical care and medical malpractice (first cause of action), negligence for failure to deliver ordinary medical care (second cause of action), and negligent infliction of emotional distress by failing to respond to his requests for treatment and negligently ignoring or disregarding his medical needs (fourth cause of action) as against the individual defendants;

- the negligent restriction of movement (third cause of action) as against the United States;

- the actions of Conmed, CCS and its employees (first, second, and fourth causes of action) as against the United States;

- the shackling allegations during El-Hanafi's transport from the MCC to the hospital (fourth cause of action) as against the United States; and

- the actions of United Security and its employees during El-Hanafi's hospitalization (fourth cause of action) as against the United States.

Defendants' motion to dismiss the state law and federal common law claims for negligent enforcement of extraordinary restrictions on movement during the flight from Dubai to the United States (third cause of action) against defendants Withers, Ryder, and Sean Cooper is GRANTED.

Defendants' motion to dismiss the state law and federal common law claims for negligent delivery of medical care (second cause of action), asserted under this Court's supplemental jurisdiction, against the employees of the Alexandria Detention Center (*i.e.* the employees of CCS and Conmed), and the federal employees of the Federal Transfer Center and the Metropolitan Correction Center, is GRANTED.

Defendants' motion to dismiss the *Bivens* claims individual federal defendants Goforth, Glover, Bussanich, Aboulfateh, Ramos, Evangelista, Hastings, Johnson, Small, Withers, Ryder, and Sean Cooper, is GRANTED.  In addition, the Court *sua sponte* dismisses the *Bivens* claim against defendant Tonya Cooper.

The only claims that survive this decision are El-Hanafi's FTCA claims against the United States under the first, second, and fourth causes of action as they relate to the provision of medical care at the Federal Transfer Center and the MCC.

The Clerk of Court is respectfully requested to close the motion pending at Dkt. No. 28.

SO ORDERED.

Dated:  January 6, 2015
        New York, New York

_____
GREGORY H. WOODS
United States District Judge

33